Doris BELL et al., Plaintiffs,

v.

BOARD OF EDUCATION, AKRON PUBLIC SCHOOLS et al., Defendants.

Civ. A. No. C78–20A.

United States District Court,
N. D. Ohio, E. D.

April 7, 1980.

Robert Allen Sedler, Detroit, Mich., Daniel T. Wilson, Randall L. Johnson, Anna Maria Barnum, Akron, Ohio, for plaintiffs.

John M. Glenn and Robert M. Gippin, Akron, Ohio, Gladys F. Burkhart, Columbus, Ohio, Ed Riegler, Eugene Oestreicher, Akron, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

On January 13, 1978 the plaintiffs, Doris and Maynard Bell, Ann and Cecil Benoit, and Paulette and Jacques McGregor, sueing on behalf of themselves and their minor children, and on behalf of all others similarly situated, filed this action alleging a deprivation of their constitutional rights under 42 U.S.C. § 1983 and the fifth and fourteenth amendments to the United States Constitution. This Court has jurisdiction of the controversy under 28 U.S.C. §§ 1331, and 1343.

Count I of the complaint alleged that the racial segregation in the Akron public schools was caused by the intentionally discriminatory actions of the defendant Board of Education of the Akron Public Schools and Superintendent Conrad Ott. Count II of the complaint alleged that the defendant City of Akron, Mayor John S. Ballard, the Akron Metropolitan Housing Authority and its director, and the President of the Ohio Real Estate Commission Paul J. Everson [1] caused the residential racial segregation in Akron by intentional discriminatory acts. In addition to a declaration of rights, the

---

1. The complaint also charged that the discriminatory acts of the Secretary of the Department of Housing and Urban Development contributed to the residential racial segregation in Akron. By motion of the plaintiff, the defendant Secretary, Patricia Harris, was dismissed on June 23, 1978. The claims against Superintendent Ott in his individual capacity were dismissed during trial at the close of plaintiffs' case.

plaintiffs sought a remedy that would eliminate the effects of any discrimination found by the Court. Under Count I they asked the Court to desegregate the schools in west Akron. Alleging that the city-wide discrimination in housing caused segregation in the schools, the plaintiffs asked the Court to desegregate the entire school system if they prevailed on Count II.

On October 6, 1978 the Court certified the case as a class action, defining two subclasses:

1. All white students and parents of white students now attending or in the future eligible to attend the Akron Public Schools.

2. All non-white students and parents of non-white students now attending or in the future eligible to attend the Akron Public Schools.

The final allegations pressed at trial were contained in plaintiffs' second, third, and final updates, filed on August 1, September 1, and September 15, 1978. The Court duly heard testimony and received exhibits on October 16 through 20, 23, and 27, 30, 31, and November 1 through 3, 1978. The following shall constitute the Court's findings of fact and conclusions of law, in accordance with Rule 52, Federal Rules of Civil Procedure.

## COUNT I: THE SCHOOL CASE

### A. *Applicable Legal Principles*

 The Akron schools were never segregated by statute, and the plaintiffs in this action do not claim that the Akron schools are operated as a completely dual school system with separate schools for white and black students. Consequently, before the school authorities can be found liable for the de facto separation of the races in the Akron schools, the plaintiffs must show that race was a factor in the decisionmak-

ing process. Proof of racially discriminatory purpose is required to show a violation of the equal protection clause. *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).[2] It is not necessary, however, to show that racial concerns were the dominant or primary factors in the decisionmaking process. If race was a factor in the decisionmaking process, the actions of the school authorities are unconstitutional. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1976).

As it is rare to find direct evidence of discriminatory purpose, the Court must look to other evidence to determine the factors which entered into the decisionmaking. Quoting *Oliver v. Michigan State Board of Education*, 508 F.2d 178, 182 (6th Cir.), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1974), the plaintiffs say that:

> A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies.

Trial Brief for Plaintiffs at 16 (emphasis omitted).

Considering this language from *Oliver* the Supreme Court recently said:

> We have never held that as a general proposition the foreseeability of segregative consequences makes out a prima facie case of purposeful racial discrimination and shifts the burden of producing evidence to the defendants if they are to escape judgment; and even more clearly there is no warrant in our cases for holding that such foreseeability routinely shifts the burden of persuasion to the

**2.** The plaintiffs further claim that the de facto segregation in the Akron Public Schools violates the equal protection clause of the four-

teenth amendment. They also recognize that under controlling precedent this Court must find against them on that claim.

defendants. Of course, . . . proof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose . . ..

*Dayton Board of Education v. Brinkman (Dayton II)*, 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720 (1979). The Supreme Court has elsewhere described the nature of the district court's factual investigation:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of official action . . . may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race emerges from the effect of the state action even when the governing legislation appears neutral on its face. But such cases are rare. Absent a pattern as stark as that in *Gomillion [v. Lightfoot*, 364 U.S. 339 (1960),] or *Yick Wo [v. Hopkins*, 118 U.S. 356 (1886),] impact alone is not determinative, and the Court must look to other evidence.
>
> The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.
>
> The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings or reports. . .
>
> The foregoing summary identified, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed. . . .

*Arlington Heights, supra* 429 U.S. at 266–68, 97 S.Ct. at 564–565 (footnotes and citations omitted).

If the Court concludes after this inquiry that the school authorities have taken actions motivated by segregatory intent and that these actions affect a substantial portion of the students, teachers, and facilities within the school system, then in most cases the Court will find that the school authorities have maintained a dual school system in violation of the fourteenth amendment. *Keyes v. School District Number 1*, 413 U.S. 189, 94 S.Ct. 27, 38 L.Ed.2d 131 (1973).

> Plainly a finding of intentional segregation as to a portion of a school system is not devoid of probative value in assessing the school authorities; intent with respect to other parts of the same school system. . . .
>
> Applying these principles in the special context of school desegregation cases, we hold that a finding of intentionally segregative acts in a meaningful portion of a school system . . . creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions.

*Id.* at 207–08, 93 S.Ct. at 2697.

Before proceeding to a discussion of the evidence offered at trial, the Court must consider the effect of the prior Akron school case, *Arnold v. Ott*, No. C65–707 (N.D.Ohio Oct. 18, 1968),[3] on the present litigation. The defendant Board and Superintendent argue that, if admissible at all, evidence concerning their actions prior to January 16, 1968 should be considered by the Court only for the limited purpose of demonstrating the intent underlying their

---

**3.** *Arnold v. Ott*, was appealed to the Court of Appeals for the Sixth Circuit; the appeal was dismissed on March 10, 1969 on motion of the plaintiff-appellants.

conduct subsequent to that date.[4] In *Arnold*, Negro and white minors brought a class action through their parents and next friends charging the defendants (the board of education, the superintendent, and the individual board members) with racial discrimination in the administration of the Akron public schools. The class certified herein is similar to the class described in the *Arnold* complaint, and the board and the superintendent were named defendants in both actions. Because of these similarities, the Court must determine how res judicata principles apply, and the effect of the *Arnold* decision on the instant action.

The school authorities argue that *Arnold* was decided after the 1966 amendment to Rule 23, Federal Rules of Civil Procedure, and that under the amended rule, res judicata operates to bar retrial of all issues which were litigated or which might have been litigated in the prior suit. See 3B Moore's Federal Practice ¶ 23.60 (2d ed. 1948); 7A C. Wright & A. Miller, Federal Practice & Procedure § 1789 (1972). Plaintiffs contend that these matters are governed by *Bronson v. Board of Education*, 525 F.2d 344 (6th Cir. 1975).

In *Bronson*, the Cincinnati school officials were called upon to defend their allegedly discriminatory practices in a second class action suit. The Sixth Circuit applied a rule of issue preclusion, holding that the plaintiffs would be permitted to offer evidence concerning events which occurred before the earlier case to shed light on the claim that minority pupils and their parents had been denied equal protection during the period involved in the later action. The Court recognized that the previous Cincinnati case was a spurious class action under the original Rule 23, and that "[a]ccording to the authorities, an adverse judgment in such an action was not binding on persons who were not parties to the class action." *Id.* at 349 (citations omitted). Still, the Court determined that the rule of issue preclusion achieves "[t]he proper balance

between the public policy of requiring a finality to judgments which settle issues in litigation and that of preventing the denial of equal protection of the law to a generation which comes after such a judgment has been rendered." *Id.*

When *Arnold* was filed in 1965 original Rule 23 was in effect, but the district court rendered its opinion in October 1968, after Rule 23 was amended. In the order promulgating the proposed 1966 amendments the Supreme Court said the amendments "shall take effect on July 1, 1966, and shall govern in all further proceedings in actions then pending, except to the extent that in the opinion of the court their application in a particular action then pending would not be feasible or would work injustice, in which event the former procedure applies." *Arnold* was pending on July 1, 1966, and the court did not make a finding that it was not feasible or that it would work injustice to apply Rule 23 as amended. Thus, *Arnold* must be treated under amended Rule 23.

It further appears from the record in the *Arnold* case that no class was ever certified as required by Rule 23(c)(1). Under amended Rule 23 the Sixth Circuit has clearly placed the burden on the district court to certify a class as required by the Rule. *Shipp v. Memphis Area Office*, 581 F.2d 1167 (6th Cir. 1978); *Senter v. General Motors Corp.*, 532 F.2d 511 (6th Cir. 1976); *Garrett v. City of Hamtramck*, 503 F.2d 1236 (6th Cir. 1974). Yet the Court has also indicated that actions should be treated as class actions where they were treated as such by the parties and by the court below, and where the requirements of Rule 23 are satisfied. *Senter, supra; see also Shipp, supra. Arnold* satisfies the requirements of Rule 23(a): the black and white students in the Akron public schools in 1965 were too numerous to be joined in one action, the question whether the school officials had discriminated on the basis of race was common to all their claims, and there is no suggestion the named representatives did

---

4. This evidentiary question was the subject of the Motion in Limine of the defendant Board and Superintendent. The Court finds that the discussion herein renders the motion moot. Accordingly, the motion is hereby denied.

not adequately protect the interests of the class. The relief sought in *Arnold* and the nature of the common questions indicate it was appropriate for class certification under Rule 23(b)(2). Nevertheless, there is a significant difference between a decision on direct appeal that in effect certifies a class action for res judicata purposes, and a similar decision in a collateral proceeding where res judicata issues are raised. Consequently, the decisions in *Senter, supra,* and *Shipp, supra,* involving cases on direct appeal cannot guide this Court in determining the effect of the *Arnold* case on the present action which is an entirely separate case.

■ Because of the potential res judicata effects of class actions, Rule 23(c)(3) states that when an action is maintained as a class action under subdivision (b)(2), the judgment, "whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class." The *Arnold* opinion describes the suit as: "a class action brought by certain minors through their parents and next friends," but the opinion never describes the class. The judgment entry is similarly defective. See *Ridinger v. General Motors Corp.,* 474 F.2d 949 (6th Cir. 1972) (case remanded in part because of the failure to describe the class in the judgment entry); *see also Board of School Commissioners v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). Because the requirements of Rule 23(c)(3) were not satisfied in *Arnold,* and because of the Court's concern about certifying the class for a prior case in a collateral proceeding, the Court will not give *Arnold* res judicata effect.

The *Arnold* decision is still binding on the named parties to the action; to that extent it is like the old spurious class action under original Rule 23. Thus, just as the Court in *Bronson* determined that a rule of issue preclusion achieved the proper balance between the relevant competing policy concerns, the Court determines that *Arnold* should preclude plaintiffs from relitigating in this proceeding the issues which were actually litigated in the prior suit. *Bronson, supra* at 349. Evidence from the period before *Arnold* is relevant background to show patterns and practices continuing after the date which may indicate race was a factor in the decisionmaking of school authorities.

## B. *Discussion and Findings of Fact*

The Akron public school system has changed dramatically over the last several decades, and the broad outlines of some of those changes are necessary to an understanding of the specific actions challenged by the plaintiffs. In 1950 the Akron Public School system was composed of 45 elementary schools serving grades kindergarten through 8, and 7 high schools serving grades 9 through 12. From the black enrollment at the high schools it appears that the black population was distributed throughout the central city, while the areas annexed in the 1920's and 1930's were virtually all white: Central High School was 11.4% black, East 13.6% black, South 18.7% black, West 35.5% black, Buchtel .6% black, Kenmore .4% black, and Garfield 4.2% black.

After World War II there was a sharp increase in the birth rate. This population bulge was eventually felt in the schools, causing housing crises at the elementary schools in the early 1950's. Kindergarten enrollments peaked in 1952 at 5,815; total elementary enrollment peaked in 1958 at 28,248. In response to changing educational concepts, and spurred by the need for classroom space, the school system moved to a new grade structure during the 1950's. Partially through remodeling and partially through new construction the system acquired its ten junior high schools during this decade. The junior high enrollment, encompassing grades 7 through 9 went from 8,000 students in 1948 to a peak of 13,260 in 1961. These students reached the senior high schools in the early 60's causing an enrollment peak in grades 10 through 12 of 12,550.

The black enrollment has steadily increased in the Akron Public Schools:

| Year | Total Enrollment | Black Students | White Students | Percent Black |
|------|------------------|----------------|----------------|---------------|
| 1950 | 38,450 | 4,815 | 33,635 | 12.6 |
| 1960 | 54,061 | 10,741 | 43,320 | 19.9 |
| 1970 | 56,426 | 15,432 | 40,994 | 27.4 |
| 1978 | 42,881 | 14,393 | 28,116 | 33.6 |

These figures also reflect another important trend: the decline in total enrollment. Declining enrollments have enabled the school system to adapt classroom space to meet modern educational programs by creating learning resource centers and similar facilities. Other programs, for example, vocational education, which is a very important part of the senior high school program, require new construction.

For the 1978–79 school year the Akron school system was housed in 9 senior high school buildings, 10 junior high schools, and 45 elementary schools. The table, attached hereto as Appendix A, sets out the enrollment at these schools and the racial breakdown of the student body. The plaintiffs' specific allegations focus primarily on schools with heavy black enrollments and their neighboring schools. Fourteen schools in the Akron school system had an enrollment 70% or more black in 1978, and in the plaintiffs' terminology these schools are racially identifiable black schools: Buchtel and South at the high school level, West, Thornton, and Perkins at the junior high school level, Bryan, Crouse, Findley, Lane, Margaret Park, Rankin, Robinson, Schumacher, and Stewart at the elementary school level. The school authorities closed Bryan at the end of the 1977–78 school year and plan to close Lane at the end of the 1979–80 school year. The plaintiffs have no objection to those closures, and did not introduce any evidence concerning actions of the school authorities that affected Bryan or Lane.[5]

In the discussion that follows, most of the figures concerning enrollments at particular schools, the racial composition of the student body, and the descriptions of boundary and option zone changes over the years have been taken from the building folders submitted as Court exhibits. The Court has also used the school capacity figures from the building folders. The Court recognizes that the capacity figures were obtained by a simple calculation,[6] that they do not reflect a school's ability to accommodate a modern educational program, and furthermore that other factors would enter into a determination of optimum utilization at any given point in time. Yet a concept of building capacity is necessary to analyze attendance zone and option zone changes.

Information concerning the number of students affected by a particular change and the race of those students was not included in the Court exhibits. The plaintiff's expert, Dr. Saltman, estimated the number and the race of students involved in a particular boundary change or option zone through a careful analysis of census information. For some of the specific changes attacked by the plaintiffs the defendant school authorities offered their own figures. Sometimes the school authorities determined the names of the particular students involved and then determined their race. For information concerning the race of students in the Mount Hope and Little Farms

5. Allegations were made concerning the teacher assignments at Bryan and Lane.

6. Building capacity is defined in the Board's answer to plaintiffs' interrogatory number 4, filed on May 2, 1978:

For elementary schools: the capacity of the building has been determined by multiplying "regular classrooms" times 30 (pupils) plus "kindergarten rooms" times 60 (pupils) to arrive at building capacity. A "regular classroom" is defined as a room which may reasonably accommodate 30 pupils for instruction and normally has a minimum of 600 square feet. No consideration has been given for this purpose to any factor except minimum room size in determining building capacity, although actually in determining the utilization of a particular building, other factors would normally have to be considered as well. This formula for the determination of building capacity may or may not have been applicable to particular buildings at a particular time in the past, but it has been treated as a workable formula in recent years when given the limited meaning herein set forth. For secondary schools, the formula for capacity has been the number of academic and special classrooms times 30 (pupils) plus the number of vocational areas times 25 (pupils).

areas, for example, the bus driver who had picked up the children years before was consulted. The Court is acutely aware of the inherent problems in the various methods used by the parties. See trial transcript Vol. 13, pp. 28–36.

In many instances the parties' figures do not differ significantly, which suggests that on the average both methods are reasonable. In some instances, however, it appears that the plaintiffs' method of applying averages to small portions of a census tract and interpolating from census data leads to faulty results. For example, the maps admitted into evidence and the testimony at trial convince the Court that the plaintiffs' estimate of 44 high school students in the Buchtel-Firestone optional zone in the northwest corner of the Buchtel zone in 1963 is unreliable. Likewise, the Court finds that no students were affected by the 1970 change in the South-Kenmore, Thornton-Kenmore boundary. Given the potential inaccuracy of census counts, the necessity for interpolating between census years, and the estimates that must be made in applying census data to changes in school boundaries and option zones, the Court prefers the defendants' figures.

## 1. High Schools

On the high school level the plaintiffs make no claims involving East, Ellet, or North High School. The Firestone, Central-Hower, Garfield, and Kenmore schools are only involved to the extent that boundary changes affecting South and Buchtel High Schools affected these four schools. Consequently, the Court's discussion of the claims involving the high schools will be structured around the changes which occurred at South and Buchtel.

7. The 1940 attendance area, and the subsequent boundary changes and option zones affecting South High School are shown on the map attached hereto as Appendix B.

8. The numbers in parentheses represent: year for which data is shown, black students enrolled/total enrollment, and percent black enrollment in the school. Where the date is clear from the context, the year has been omitted.

In 1940 South High School was located in the present Thornton Junior High School building, near the intersection of Thornton and South Main Streets. The South attendance zone was bounded on the north by Wooster Avenue. At Pine Street the boundary angled southeast to the railroad tracks, heading east along Cross Street to Brown Street, then south, gradually angling west. After again meeting the railroad tracks, the boundary ran south along the tracks to the canal, north along the canal to the southern tip of Summit Lake, northwest along Manchester Road, and then west along Indian Trail. Finally, the boundary ran north along Hawkins to the intersection with Wooster.[7] The building capacity was 1,320 students and it was serving an enrollment of 2,045 ('42 157/1704 9.2%).[8]

Several optional zones involving South High School which were created in the early years have continued to the present. In 1944 the southeast corner of Copley Township across from Collier Road and known as Akron Little Farms was made optional between Buchtel, Kenmore, and South. The Mount Hope area (south of Wooster, bounded on the east by Hawkins Avenue, cutting west across Mud Run Park, then due south along the western edge of the Park, continuing south to the corporation limit) was optional between Buchtel, Kenmore, and South from 1955 through 1978.[9] Both areas were remote from the schools.

In 1950 the area north of Bartges Street on the western edge of the Opportunity Park urban renewal area was transferred from South (225/1203 18.7%) to West (237/668 35.5%). Serving an enrollment of 668 students with a capacity of 1200, West was then substantially underutilized.

Occasionally, as in this instance, the racial data is not available for the specific year under discussion and the Court has used data from the first year available thereafter.

9. Several small changes in the area known as Mount Hope will be detailed in the discussion of the elementary schools.

Another optional zone was created in 1952, this one within the South attendance zone. A line was drawn south on East Avenue to Manchester, turning east at Lakemont and then running south down the center of Summit Lake; all students west of the line were given the option of attending Kenmore.

In 1953 West High School became West Junior High School and the area immediately north of the northeast corner of the South attendance zone—southwest of West Exchange Street, west to Perkins Park—was placed in the South attendance zone. In 1954 a small square in the southeastern portion of the South attendance zone (353/1033 34.2%) was transferred to Garfield (72/1110 6.5%). The change put an additional 49 white students into Garfield which was then underutilized serving an enrollment of 1110 with a capacity of 1260. The change with Garfield made the senior high boundary equivalent to the boundary between the junior high schools. (The area was very close to Goodrich, the junior high serving the Garfield attendance area.)

As part of the move to the new grade structure in the 1950's the Board began searching for a building site in the South zone. There were only two undeveloped sites within the South attendance zone: one was owned by the city of Akron, and the other was owned by the Catholic Diocese of Cleveland adjacent to Saint Mary's School. The site owned by the Cleveland Diocese was next to the South/Thornton building, but the Diocese refused to sell. Rather than condemn property and tear down homes to build a new school, the Board chose in 1954 to work out an agreement with the city and to build on the other undeveloped site. Thus, the new South High School building which opened in 1956 (391/862 45.4%) was located 1.4 miles west of the present Thornton building, just one block south of the northern edge of the South attendance zone.

With the opening of the new school, the former South-Kenmore option was cut down to include only the extreme southwest corner of the attendance zone. Several blocks in the southwest corner of the South attendance zone, along Manchester and Leighton, were moved into the Kenmore zone. The change affected 6 white students at the high school level, and was matched by changes at the junior high and elementary school levels. The portion of the South zone east of the railroad tracks was quite a distance from the new school, and the area east of the tracks and north of South Street was made optional to Central (208/1102 18.9%). The area east of the tracks and south of South Street was made optional to Garfield (58/1135 5.1%). The area in the Buchtel attendance zone (61/1220 5.0%) from Wooster Avenue north to Diagonal Road (bounded by Perkins Park in the northeast) was made optional to South. The establishment of this zone permitted 184 white students and 11 black students to attend South instead of Buchtel if they chose. Adjacent to this option zone, the east side of Fern and the south side of Euclid from Fern east to Edgewood were moved from Buchtel to South. (A year later the houses on the north side of Euclid were taken out of the option zone and added to the South zone. This change affected 5 black students, and made Perkins Park the boundary between the schools.)

The plaintiffs claim that the new South High School was built as a containment school for blacks. They point to its capacity of 900, substantially below the 1,320 capacity of the South/Thornton building. At the same time the plaintiffs contend that the option zones around the South building permitted white students to escape attending South and enabled them to attend "whiter" schools instead.

The plaintiffs rely heavily on the testimony of Reverend Morgan, a black man who is now a school board member. About the time the new South High School opened, Rev. Morgan received a phone call from Mrs. Case, a white woman who was then on the board. She said something to the effect that the black community did not need to be concerned about the representation of black persons on the school board because the new South High School was a good

school for colored people. After 20-plus years Rev. Morgan's testimony understandably reflected only the broad outlines of his phone conversation with Mrs. Case. The Court finds no reason to doubt the accuracy of the recollection, but the Court cannot draw any inference of intent from this isolated statement. The Court finds simply that Mrs. Case was aware that the new South High School would have a number of black students in attendance.

With respect to the capacity of the new South building, the defendants argue that it was built to serve its projected enrollment. The building levy that enabled the Board to build South High also provided the funds to construct East High School and several junior high schools. Since there is no claim that race was a factor in the decisions affecting East High School, a comparison of East and South is a very useful tool for evaluating whether race was an unarticulated factor in the decisions affecting South High School. A comparison of the enrollments at South and East before the construction, making allowance for the change in the grade structure that the new buildings were to serve (10 through 12 instead of 9 through 12), demonstrates that both buildings were constructed to serve their projected enrollments.[10] Furthermore, the size of South was comparable to the other secondary schools built at about the same time to serve three grades.[11] Finally, if the Board had intended to make South a containment school, it could have done a better job. For example, the South attendance zone could have been altered to bring blacks in the Buchtel-South option zone into South, or the predominately white area in the old South-Kenmore option (which was in effect from 1952 through 1956) could have been put into Kenmore.

The plaintiffs also draw inferences of racial motivation from the number of optional zones surrounding the new South High School when it opened. But the Court finds that the new location of South High School is the reason for the unusually high number of option zones. The options to Garfield, Central, and Buchtel were created in 1956; the optional zone with Kenmore was substantially reduced in 1956. The timing and the location of the option zones demonstrate that they were created because of the distance (or in the case of the Buchtel-South option, proximity) to the new South High School.

In 1958 the area east of the railroad tracks that had been optional to Garfield since 1956 was put into the Garfield zone (91/1395 6.5%). There were approximately 15 white and 35 black high school students in this area who had already been exercising the option to Garfield, so the change had no effect on the South enrollment in 1958. The area in the southwest portion of the South zone which had been optional to Kenmore, and additional area to the north of the option zone was transferred from South (445/959 46.4%) to Kenmore (11/1806 .6%) in 1958. The change affected 98 white students and 2 black students; 34 of the students had already been exercising the option to Kenmore. The same area was also transferred from Thornton to Kenmore on the junior high school level. Contemporary documents indicate that the superintendent perceived that there was room to accommodate the students at Kenmore.[12]

---

10. For the period before the construction of the new school the enrollment at East had averaged 1602; three-quarters of that is 1202. Enrollment at South had averaged 1197, three-quarters of that is 900. Similarly, the available projections from 1954 show a projection for East, grades 7 to 12 of 2,073. Five-tenths of that is 1038, and the new East building was constructed with a capacity of 1050. South projections from 1954 show an anticipated enrollment of 1,502 students in grades 8 to 12 for 1962. That would be the equivalent of 900 in

grades 10 through 12, and South was built with a capacity of 900.

11. Ellet was built in 1950 with a capacity of 750; East in 1955 with a capacity of 1,050; South in 1956 with a capacity of 900. Kent Junior High was built in 1954 with a capacity of 990; Perkins Junior High in 1954, capacity 1,110; Litchfield in 1959, capacity 840; Innes in 1959, capacity 840; Hyre in 1960, capacity 840.

12. Board exhibits OOOO, PPPP. The information from the Kenmore building folder suggests

In 1960 the small area in the South zone south of the expressway was transferred to Kenmore. The change was made to relieve Thornton at the junior high level, while trying to maintain common junior and senior high school boundaries in this area. By 1960 construction on the expressway made it difficult for students to reach South. Approximately 30 white students were affected. Also in 1960 the option to South was removed for the 5 white students in the extreme west end of the Buchtel-South optional zone.

In 1962 Fern Street was moved from the South zone to the Buchtel zone, and the area that had been optional between South and Central since 1956 was moved to Central. The area transferred to Central contained about 105 white and 30 black high school students. South High School was over capacity by about 100 students in 1962, with an enrollment of 1,016. Enrollment peaked the next year at 1,109 students (812/1109 73.2%). Between 1966 and 1967 the Opportunity Park urban renewal project caused enrollment to drop from 1,066 to 975. Enrollment has gradually declined since then, reaching 608 in 1977 (593/608 97.6%). A technical description change was made in the attendance manuals in 1970 placing the South-Kenmore boundary along the expressway. No students were affected. The Court finds that race was not a factor in any of the decisions involving attendance zone or option zone changes at South High School.

The second high school which is the focus of the plaintiffs' allegations is Buchtel High School ('42 17/1385 1.2%), located in central, western Akron on Copley Road. In 1940 the Buchtel attendance zone was bounded on the north and west by the corporation limit. The eastern boundary started at the intersection of North Portage Path and the corporation limit, running south along South Portage Path, then southwest along Diagonal Road, south along East Avenue, and west along Wooster Avenue up to the

corporation limit. In 1950 a small triangle southeast of the intersection of South Portage Path and West Exchange Street was transferred from West to Buchtel.

When West became a junior high school in 1953 the great bulk of the West attendance zone was transferred to Buchtel. After the change in 1953 the eastern boundary of the Buchtel zone ran south along the Ohio canal for quite a distance, the boundary then angled west cutting off the southern corner of the Mount Peace Cemetery, angling down in several jogs to run along Hall Street, west along Copley Road to Edgewood, west along Euclid (including the homes on the south side of Euclid), south along Fern Street (including the homes on the east side of Fern), finally running west along Wooster Avenue.

In 1956 and 1958 there were two small boundary changes between Buchtel and South which have been previously discussed with respect to South; likewise, the Buchtel-South optional zone created in 1956. In 1966 students living along Fern were again reassigned from South to Buchtel.

The other major change in the Buchtel zone was the transfer of the northern portion of the zone to Firestone High School when it opened in 1962. The Firestone zone was carved out of the Buchtel zone, bounded on the west and north by the corporation limit, on the east by the Ohio canal. Moving from east to west the southern boundary ran just south of Memorial Parkway, continuing just south of Twin Oaks Road, then northwest down the center of West Market Street, turning southwest if followed Franks Boulevard to the corporation limit. Two optional zones were created between Buchtel and Firestone. The first was created with the opening of Firestone in 1962. Equivalent to the West-Litchfield option zone at the junior high school level, this area was bounded on the west by North Portage Path, on the south by Edgerton

otherwise. With a listed capacity of 1,440, Kenmore's enrollment was 1,742 in 1957, 1,806 in 1958, and 1,453 in 1959. At the time of the change the school authorities knew that Innes

Junior High School was scheduled to open in 1959 to serve part of the Kenmore attendance area.

and Pasadena, on the east by the Ohio canal, and on the north by Memorial Parkway.[13] The second optional zone was created a year later and included the sparsely settled area north of Mull Avenue and south of Franks Boulevard in the northwest corner of the Buchtel zone.[14]

The plaintiffs' arguments concerning Buchtel ('62 229/1953 11.7%) center on the construction of Firestone High School ('62 0/661 0%). They say that the construction of Litchfield Junior High in 1959 on a campus site, and the anticipated construction of a high school on the same site spurred population growth in northwest Akron. Further, they say that by the placement of the new high school, and by dividing the old zone with an east-west line rather than a north-south line the school authorities intended to make Buchtel a black school and the new school a white school. The evidence establishes, however, that the construction of homes in northwest Akron preceded the construction of Litchfield Junior High. Elementary school enrollments in the area also reveal the growing student population. The Board does not operate under a neighborhood school policy as such,[15] but schools have been built near the students they are to serve because transportation of students costs the Board money that could otherwise be spent on programming. The Court finds that Firestone High School was built to serve an existing pupil population.

The decision to build the Firestone-Litchfield complex on its present site can be further understood by looking at the location of Buchtel High School and the residential and commercial development patterns within the Buchtel zone as it existed at the time the decision was made. Buchtel was at the approximate center of the zone on an east-west line, but on a north-south line it was substantially to the south of the zone. The western portion of the attendance zone along the corporation limit was, and is, sparsely developed. A large metropolitan park is located in the extreme northern portion of the zone near the corporation limit. The main traffic arteries West Market Street and West Exchange Street run from downtown Akron to the northwest corner of the city bisecting the zone. Residential patterns were well developed around Buchtel, and were developing in the area south of the metropolitan park. These areas were separated by commercial development at the intersection of West Market and West Exchange Streets and around the railroad crossing on West Market Street. It was logical to build the new high school near the students it would serve in the residential area to the north.

These, and other similar matters, also explain the two option zones. The Buchtel-Firestone optional zone created in 1962 was approximately the same distance from each of the schools, perhaps a little closer to Buchtel. To reach Buchtel the students would have to cross both West Market and West Exchange Streets. To reach Firestone, however, the students would have to circumvent the Portage Country Club. The

13. The plaintiffs sometimes refer to this option as the "hidden" optional zone between Buchtel and Firestone. The Court finds the evidence does not support this characterization.

14. The Buchtel and Firestone attendance zones and the two optional zones are shown on the map attached hereto as Appendix C.

15. The Board's answer to interrogatory 23 of the plaintiffs' second set of interrogatories, filed on July 13, 1978, explained:

The Board and Superintendent operate the Akron Public Schools pursuant to statutes, including R.C. § 3313.48. The Superintendent exercises his judgment as to that method of assignment of students most likely to con-tribute to the development of a sound educational program for the Akron Public Schools, consistent with the requirements of reasonable economy and efficiency in the use of its resources. The term "neighborhood school policy" does not provide and has not provided any specific guidance with respect to the Superintendent's assignment procedures . . . Section 3313.48 of the Ohio Revised Code, presently provides, in pertinent part:

The board of education of each city . . . . shall provide for the free education of the youth of school age within the district under its jurisdiction, at such places as will be most convenient for the attendance of the largest number thereof. . . . .

optional zone created in 1963 was substantially closer to Firestone than to Buchtel, but it was separated from Firestone by West Market Street and the commercial development around the railroad tracks. Distance and access factors made it logical to give an option to students in these two areas. The Court finds that race was not a factor in any of the decisionmaking affecting Buchtel High School.

At the high school level the plaintiffs also attack the policy of permitting students to transfer outside of their home district to take a course which is not offered at the home school. Such special subjects transfers are one of thirteen kinds of special permits that are issued by the Office of Pupil Services to allow students at any grade level to attend schools outside the attendance zone of their legal residence. The attack on special subjects transfers policy applies only at the high school level because the curriculum uniformity at the elementary and junior high schools precludes such transfers in the lower grades.

The policy is, on its face, racially neutral. The figures compiled by the plaintiffs from data supplied by the school authorities demonstrate that the policy increased the proportion of black students attending South and Buchtel (Plaintiffs' exhibits 60, 61). There is no evidence, however, that suggests that race was a factor in decisions by the school authorities regarding the transfer policy. The authorities recognized that transfer policies could be abused, but the Board Letter of November 16, 1964 (Plaintiffs' exhibit 89), and the testimony of Theresa Haney indicate that the authorities have been vigilant in monitoring the program to assure that students transferring for special subjects enroll in and complete the course (or courses) which were the basis for the special subject permit.

2. *Junior High Schools*

On the junior high school level the plaintiffs made no claims with respect to Jennings, Goodyear, or Hyre. Five other schools, Litchfield, Goodrich, Kent, Kenmore, and Innes, are only involved to the extent that boundary changes and optional zones with those schools also involved Perkins or West or Thornton. The discussion of the plaintiffs' claims concerning the junior high schools will therefore be organized around a discussion of the changes which occurred at West, Thornton, and Perkins.

West Junior High School was the first junior high in west Akron. When it opened in 1953 (305/1009 30.2%) in the old West High School building its attendance zone was huge. Starting at the northern corporation limit the zone was bounded on the east by the Ohio canal. The boundary followed the canal into the downtown area, following Main Street through downtown when the canal disappeared, and picking up the canal when it reemerged south of downtown. The boundary then followed Wooster Avenue west to the intersection with Hawkins, north on Hawkins to Diagonal Road. The boundary then angled northeast following Hardesty Boulevard north to Courtland Avenue, then east to Packard Drive, north to Stoner Street, east to Mercer Avenue, north to Cadillac, east to Storer Avenue, north to Copley Road, east to Noble Avenue, and north to Delia Avenue. The boundary line followed Delia Avenue and Hollinger west to North Portage Path; following it north to Memorial Parkway. Finally the boundary ran north to the corporation limit on Merriman Road. Students from the Mount Hope and Little Farms areas were assigned to West along with their classmates from Crouse Elementary School who were within the West attendance area. In 1955 several blocks just north of downtown, south of the railroad tracks and west of the viaduct leading to North Hill, were moved from the Jennings Junior High attendance zone to the West Junior High zone. Mount Hope was reassigned to Innes (grades 7 and 8) and Kenmore (grade 9) in 1959.

Litchfield Junior High opened in 1959 in northwest Akron, and the area north of Memorial Parkway was reassigned from West (646/1254 51.5%) to Litchfield (0/481 0%). In 1960 a small area north of Wooster Avenue, bounded on the west by Hawkins

Avenue, on the north by Diagonal Road, and on the east by Hardesty Boulevard was transferred to Perkins. In 1962 the boundary with Litchfield established several years earlier was moved south to include the houses on the south side of Memorial Parkway. This change gave the junior and senior high schools a common boundary; although the number of students involved is unknown, only three houses were affected. In 1966 another small area was transferred from West (895/1230 72.8%) to Perkins (266/1148 23.2%), just south and east of the area which had been reassigned in 1960. Sixteen of the 24 students affected by the 1966 change were black.

In 1966 Akron Little Farms was assigned to Perkins. Starting in 1968 and continuing through 1970 there was a phased move of pupils from West to Thornton ('68 727/1021 71.2%). The area involved was, in rough terms, west of West Exchange Street, east of East Avenue, south of Euclid and north of Wooster. Thornton was underenrolled because of the Opportunity Park urban renewal project. (With a capacity of 1,320 Thornton's enrollment in 1967 was 997; in 1970 it was up to 1,052.)

Ever since Litchfield opened in 1959 there has been an optional zone between Litchfield and West. For the first year the area was partially in the Litchfield zone and partially in the West attendance zone: bounded on the west by West Market Street, on the north by Twin Oaks Road and Memorial Parkway, on the east by the Ohio canal, and on the south by Edgerton Road (including the houses on the south side of Edgerton Road). In 1960 the southern boundary of the optional zone was moved south to include the homes on the north side of Pasadena and the western boundary of the optional area was changed to North Portage Path; the optional area was then contained entirely within the West attendance zone. In 1962 the optional zone was expanded once more to include the houses on the south side of Pasadena. The inclusion of the north side of Pasadena in the option zone affected eight houses. When the line was moved to include the south side of Pasadena no houses were affected.

The plaintiffs make a number of claims concerning West. Initially they attack the reassignment of the northern portion of the attendance area to Litchfield, and the reassignment of the southern area—Mount Hope—to Innes. West was one of the first schools to open as a junior high, and it was natural that its original attendance area would be redefined as other junior high schools opened in other parts of the city. The areas detached from the West zone were the farthest from the school. Although they appear very large, neither area was heavily developed.

Plaintiffs next focus on the West-Litchfield optional zone. When the option was created, West, with a capacity of 1,200, was overcapacity with an enrollment of 1,254. By making the area optional to Litchfield, the school authorities hoped to relieve enrollment pressure at West without the cost of transporting the students to Litchfield. West enrollment did not drop to capacity until 1968. The plaintiffs note that the Board failed to abolish the option after 1968. The Court, however, refuses to draw any inference of intent to discriminate from this continuing option, and finds that it is consistent with the policy of the Board and Superintendent not to redefine attendance areas or reassign students without a reason.

Finally, plaintiffs attack the series of smaller changes in the West attendance area which occurred throughout the 1960's. As has been noted, West was overcapacity throughout this entire period. The proportion of black students enrolled also increased, from 58.5% in 1960 to 77.2% in 1969. Census data presented to the Court reflects that between 1960 and 1970 the black population in census tract 5068, which is within the West attendance area, went from between 50% and 75% of the total to over 75% black.[16] The Court finds no basis for an inference that race was a factor in

---

16. A portion of census tract 5065 is also in the West attendance area; its population went from less than 10% black in 1960 to between 25% and 50% black in 1970.

the decisions of the school authorities affecting West Junior High.

Thornton Junior High opened in the old South High School in 1956 when South moved to its new building. Starting at the intersection of Wooster Avenue and Water the Thornton boundary ran along Water to Exchange Street, southeast to Brown Street, south to Thornton Street, west to Allyn Street, south to South Street, west to Grant Street, south to the railroad tracks. The boundary followed the tracks for about one block west, turned south on Bellows Street, west on Stanton Avenue, then south on Marcy Street for two blocks, then running west and picking up the railroad tracks again. From the intersection of the railroad tracks and the Ohio canal the Thornton boundary followed the same line as the 1940 boundary of the South High School attendance zone, west, north, and east back to the intersection of Wooster Avenue and Water.

In 1960 the four blocks in the southeast corner of the Thornton zone, west of Sweitzer Avenue and south of Cole Avenue, were made optional to Goodrich Junior High (81/923 8.8%). In 1962 the area was transferred to Goodrich (109/927 11.8%). The change paralleled a change at the elementary level and affected 20 students, 2 of them black. In 1964 the northeast corner of the Thornton zone, west of the railroad tracks, north of Wheeler and Power Street, was moved from Thornton ('63 596/1125 53%) to Spicer ('63 49/560 8.8%). Access was better to Spicer for the 30 white students and 10 black students affected. The change also reflects the new grade structure at Spicer which was implemented to relieve crowding at Goodrich.

When Thornton opened in 1956 the southwest corner of the attendance zone, which had been optional between South and Kenmore at the high school level, remained optional to Kenmore. The area was equivalent to the optional zone between South and Kenmore for 1956–58. In 1957 the optional

area was expanded to include the north side of Saxon Avenue. In 1958 the option zone, and an additional area north of the option zone (equivalent to the area transferred that same year on the high school level between South and Kenmore) was moved into the Kenmore zone. Contemporary Board Letters from the Superintendent to the Board indicate that the school officials perceived that there was space at Kenmore, while Thornton was suffering from enrollment pressures (Board exhibits OOOO, PPPP). Since the Board had been busing the students to Thornton, the change enabled the Board to save transportation costs. Construction of the expressway made access to Thornton difficult, and in 1960 another small area (paralleling the change at the high school level made the same year) was moved from Thornton to Innes/Kenmore. Another change in 1970 was simply a description change and affected no students. The only other change affecting Thornton was the phased move from West in 1968–70 which has been discussed in connection with West Junior High.

For their claims concerning Thornton Junior High the plaintiffs focus on a series of changes, juxtaposing them against the increasing black enrollment at Thornton during the late fifties and early sixties. The Court finds that distance and access factors were the concern that prompted the early changes involving Kenmore. Enrollments were rising, and school authorities were building many new buildings; thus the elimination of transportation costs was also a factor as the school authorities budgeted for construction and increased building costs. The Opportunity Park urban renewal project and the construction of the expressway also changed substantially the complexion of the Thornton attendance area. Census data reflects increasing proportions of black people in the attendance area.[17] From an analysis of these factors and the changes affecting Thornton, the

17. Census tracts 5019 and 5052 were less than 10% black in 1960. In 1970 the black population in both tracts was between 25% and 50%.

Court concludes that race was not a factor in the decisionmaking.

Perkins was constructed as a junior high school. It is located near the municipal golf course in west Akron, on Mull Avenue. All of the area northwest of the West Junior High School attendance zone was in the Perkins attendance zone in 1954. When Litchfield Junior High opened in 1959 all of the area north of West Market Street was taken out of the Perkins attendance zone (37/1180 3.1%) and assigned to Litchfield. In 1960 the triangular area bounded by West Market Street, Twin Oaks Road and North Portage Path was taken out of the Litchfield zone (0/778 0%) (and out of the Litchfield-West optional zone) and put in the Perkins attendance zone. In 1962 the houses on the south side of Twin Oaks Road were returned to the Litchfield attendance zone.

Several blocks north of Wooster Avenue between South Hawkins Avenue, Diagonal Road, and Hardesty Boulevard were also moved in 1960 from West (756/1293 58.5%) to Perkins (50/1174 4.3%). In 1962 the area along Wooster Avenue, just south of the area transferred in 1960, was moved from West to Perkins. In 1966 the area to the east, from the south side of Wooster Avenue, north to Courtland Avenue, bounded on the east by Superior Avenue, was moved from West (895/1230 72.8%) to Perkins (266/1148 23.2%). Twenty-four students were affected by the 1966 change, 16 of them black. In 1966 the Akron Little Farms and Mount Hope areas were assigned to Perkins.

Due to increasing enrollment pressure at Perkins the southwest corner of the Perkins zone, west of Hawkins Avenue and south of Esterbrook Road and Redbush Road (including the houses on the north side of these two streets), was transferred to Innes Junior High (32/1322 2.4%) in 1971, along with students from Akron Little Farms and Mount Hope. Although Innes was over capacity in 1971, and still slightly over for 1972, it was under capacity for all the other years from 1969 through 1974.[18] Of the 6 students affected by the change, 3 were black and 3 white. The plaintiffs focus on this last change to Innes in making their claims involving Perkins. The Court finds that the change was prompted by enrollment pressure at Perkins and the available space at Innes. Furthermore, the Court concludes that plaintiffs have failed to show that race was a factor in any of the decisions affecting Perkins.

### 3. *Elementary Schools*

In discussing the plaintiffs' claims with respect to the elementary schools the Court will again focus on the schools central to the plaintiffs' contentions: Findley, Robinson, Crouse, Lane, Margaret Park, Rankin, Schumacher, and Stewart.

Findley is located at the intersection of Tallmadge Avenue and Cuyahoga Falls Avenue in north Akron. In 1940 its attendance zone was bounded by the corporation limit on the north; North Howard, Chalkee Street, North Main Street and Dayton Street on the east; Olive Street on the south; and the Ohio canal on the west. A narrow strip of land south of the main part of the attendance zone lying north of the railroad tracks between Cuyahoga Street and the Ohio canal was also in the Findley zone. The southern tip of the narrow strip of land was put in the Crosby attendance zone in 1959. The rest of the strip was put in the Bryan attendance zone in 1967.

The plaintiffs' claims concerning Findley ('55 111/804 13.8%) center on the optional zone with Harris Elementary School ('55 8/670 1.2%) created in 1955, shown on the map in Appendix D. The land area within the optional zone was greatly expanded in 1962, and it was expanded again in 1971. Despite its size, however, the option zone change in 1962 affected only 11 students. All were white. Except for the extreme southeastern portion of the option zone, the area was very sparsely settled. The settled area was actually a little closer to Harris

18. Innes had a capacity during this period of 1,290 students. Its enrollment was 1,244 in 1969, 1,229 in 1970, 1,322 in 1971, 1,295 in 1972, 1,238 in 1973, and 1,193 in 1974.

than to Findley. The option was created because of distance and access factors. The Court finds race was not a factor in the decisions affecting Findley.

Robinson School is located in east Akron on Fourth Avenue. In 1940 the boundary of the Robinson attendance area ('42 163/1326 12.3%) ran along First Avenue, turned south to run along the railroad tracks; then it turned east to cut off the northern tip of Joy Park and run along Milton Street to Arlington, then north to McKinley Avenue, north along Wynans Avenue, continuing north back to First Avenue. The one major change in the Robinson attendance zone occurred in 1941 when the area south of East Market Street and Cuyahoga Falls Avenue was transferred from Kent.

Over the years the houses along Wynans Avenue have been juggled between attendance zones, starting in 1955 when the houses on the northern end of the street and on the west side of the street were given an option to attend Mason. In 1962 the area was apparently transferred into the Mason zone. Nevertheless, the option continued until 1967; then, due to a boundary change between Mason and Glover Elementary Schools, it became an option to Glover, which continued through 1977. The southern portion of the west side of Wynans was made optional to Glover in 1959. The option continued through 1961, and in 1962 the area was included in the Glover attendance zone.

There was also an optional area north of Clark Street, including an area along Arlington Street, in the northwest portion of the Robinson zone ('55 731/1239 59%). It was optional to Mason ('55 63/910 6.9%) from 1955 through 1961. When the option terminated the 20 white students affected lost the option to Mason. Robinson had been overcrowded for a long time when the

option was created and Mason was well under capacity. The enrollment figures for Robinson indicate that the area was returned to Robinson when it had the capacity to serve its student population.[19] The Court finds no reason to infer that race was a factor in the decisionmaking affecting Robinson as described above.

Crouse is located on Diagonal Road directly across the street from Perkins Park.[20] In 1940, starting at the intersection of Copley Road and Edgewood Avenue, the Crouse attendance boundary ran south to Euclid, west to Mallison Avenue, south to Wooster Avenue (picking up the houses on the south side of Wooster from East Avenue west), west to Hawkins Avenue, north to Courtland Avenue, east to Packard Drive, north to Stoner, east to Mercer Avenue, north to Cadillac, east to Storer Avenue, north to Copley Road, and west on Copley back to the intersection with Edgewood.

In 1942 an area of approximately five blocks along Courtland Avenue in the northwest corner of the attendance zone was moved from Crouse (91/720 12.7%) to Schumacher (0/582 0%). In 1945 the area west of Hardesty and north of Diagonal Road was likewise moved from Crouse to Schumacher. Also in 1945 Akron Little Farms and Mount Hope were reassigned from Schumacher to Crouse. The southern portion of the Mount Hope district had an option to attend Lawndale.

From 1952 to 1960 enrollment at Crouse exceeded the building capacity for all except three years. The proportion of black students was steadily increasing through this period going from 21.1% to 85.3%. In response to the enrollment pressure, Akron Little Farms and Mount Hope were transferred to Margaret Park Elementary School (102/1076 9.5%) in 1956. Of the 100 students affected by the change, 30 were

---

19. Robinson had a capacity of 1,230 students throughout this period. The enrollment at Robinson was 1,406 in 1951, 1,351 in 1952, 1,456 in 1953, 1,405 in 1954, 1,239 in 1955, 1,282 in 1956, 1,314 in 1957, 1,307 in 1958, 1,305 in 1959, 1,298 in 1960, 1,246 in 1961, and 1,187 in 1962.

20. The attendance boundary changes and optional zones involving Crouse, Erie Island, Rankin, and Schumacher are shown in Appendix E.

black. That same year the area south of Euclid between Fern and Mallory in the southeast corner of the attendance zone, which had been optional to Lane ('55 545/955 57.1%) in 1955,[21] was reassigned to Crouse ('56 602/1101 54.70%). In 1958 the area was transferred back to Lane. In 1960 part of the same area was transferred back to Crouse.

Even with an increased capacity of 1110 students (up from 1080) the enrollment at Crouse ('62 1138/1228 92.7%) exceeded the building capacity by roughly 100 students in 1961 and 1962. In 1962 the area south of Bisson Avenue and Diagonal Road was made optional to Margaret Park (188/970 19.4%). The area contained about 200 elementary students, 75% of them black. Only 23 students opted for Margaret Park in 1963. (This option continued through 1978; few students exercised the option.) In 1963 several blocks either side of Fern were transferred to Lane (814/856 95%); all 30 students affected were black. Also in 1963 several blocks around Fernwood were transferred to Portage Path (27/874 3.1%), and several blocks north of Little were transferred to Rankin (39/976 4.3%). Of the 30 students affected by the change to Portage Path, 28 were black. Similarly, 39 of the 42 students affected by the boundary change with Rankin were black. From its analysis of these changes involving Crouse, the Court finds that enrollment pressures were the overriding concern and that there is no basis to infer that race was a factor in the decisionmaking.

Lane Elementary School is located southeast of Crouse Elementary School, behind South High School on Howe Street. In 1940 the northern boundary of the Lane attendance zone ran just south of the houses on the south side of Euclid. On the east it was bounded by Rhodes Avenue, on the south by Thornton Street, and on the west it ran just east of the houses on the west side of Manchester Road and East Avenue, along Wooster Road, and just east of Fern.

Three of the four changes in the Lane attendance area and the one option zone involving Lane were changes involving Crouse, which have already been discussed. The one other boundary change at Lane occurred in 1963 when the area west of Moeller Avenue and south of Howe Street in the southwest corner of the zone was moved to Margaret Park. With the exception of 1960, Lane ('63 814/856 95.1%) had been over capacity every year since 1958. Since part of the Crouse attendance area had to be moved to Lane to relieve crowding at Crouse, this area was moved to Margaret Park ('63 352/1080 32.6%). Margaret Park was under capacity and could accommodate the 20 white students and 100 black students affected by the move. The Court finds no reason to infer that race was a factor influencing the decisions affecting Lane.

Margaret Park Elementary School is located near the northeast corner of Summit Lake, just south of the expressway. In 1940 the Margaret Park boundary ran east along Wooster Avenue to East Avenue, south to Manchester, south to Thornton Street, east to the canal, south along the canal and the eastern shore of Summit Lake, west to 8th Street, angling northwest, then running west just south of Jason Avenue, to Hawkins Avenue, and then north to Wooster Avenue. In 1953 the zone was extended south between East Avenue and 8th Street to pick up the houses along Indian Trial. Part of area had been in the Pfeiffer attendance zone, and part came from the Smith attendance zone.

As noted previously Akron Little Farms and the Mount Hope district were moved from Crouse to Margaret Park in 1956. The option to Lawndale for the students in the southern part of the Mount Hope district continued. Also in 1956 an area in the northwest corner of the Margaret Park (102/1076 9.5%) attendance area was made optional to Crouse. Starting at the intersection of Fess and Wooster Avenue, the

---

**21.** The option zone map seems to show a Crouse-Lane option in 1955, but the boundary maps in the building folders show the area was moved from Lane to Crouse in 1956, suggesting that the option should be denominated a Lane-Crouse option in 1955.

boundary for the optional zone ran south to Pontiac Avenue, south on Tyler, continuing south all the way to Morse Street and west to Hawkins Avenue. The option to Crouse was in effect for only a year. In 1959 the southern tip of the Mount Hope area, which was actually part of Norton Township, was removed from the school system. The size of the Mount Hope area was further reduced in 1964 when the area south of the cemetery was detached to the city of Barberton, and in 1967 when the area west of the corporation limit was detached to the Norton school system.

Apparently in response to enrollment pressure at Margaret Park during 1965, 1966 (537/1110 48.4%), and 1967 (621/1155 53.8%) the Mount Hope area was not included in its attendance area for 1968 through 1970. Mount Hope students had the option to attend either Lawndale or Margaret Park through this period. In 1970 enrollment at Margaret Park (646/960 67.3%) had dropped, and all of the Mount Hope area north of the northern edge of the cemetery was put into the Margaret Park attendance zone. The southern portion of the Mount Hope zone, which had been optional to Lawndale at least since 1955, was put into the Lawndale attendance area in 1970. Students opting to Lawndale had been crossing Mud Run by stepping stones until the late 1960's when a footbridge was put in; in 1970 the Board could assign the students to Lawndale without fear of complaints from parents about the stream crossing.

Another option had been created in 1955 for the area in the Margaret Park attendance zone southeast of Morse Road, Burry Avenue, and Saxon Avenue. Students in the zone who lived west of 13th Street had the option to attend Smith, and those east of 13th Street could opt for Pfeiffer. In 1957 the optional areas were expanded to include both sides of Saxon Avenue. In 1960 the option to Pfeiffer was expanded to include houses south of Marie Avenue and Lakemont. In 1962 the option to Smith was extended north to Morse Street and Marie Avenue; the option to Pfeiffer was expanded to include both sides of Marie and

Hillcrest. (1962 was also the year the option to Margaret Park was created in part of the Crouse zone as previously outlined.) The options with Smith and Pfeiffer were terminated in 1966. During the period that these areas were optional zones, Margaret Park was operating somewhat below capacity; substantially below capacity in 1961 and 1962. Pfeiffer and Smith were operating at close to capacity. The students attending Pfeiffer were all white until 1966 when the black enrollment jumped to 2%; Smith remained essentially all white through 1977. The Court finds, after examining these changes, that race was not a factor in the decisionmaking that affected Margaret Park Elementary School.

Rankin Elementary School ('42 0/652 0%) is located north of Schumacher and Crouse. In 1940 the northern boundary of the Rankin attendance area ran along Mull Avenue from the corporation limit on the west, to West Exchange Street on the east. The eastern boundary followed West Exchange Street southeast to Burton Avenue, then south to Delia Avenue, east to Wildwood, south to Work Drive, east to the west side of Beechwood, south to Copley Road, west to the eastern edge of the Buchtel High School campus, north to Peckham Street, west to Mineola, north one block to Bye Street, then west to the corporation limit. In spite of an addition in 1953, increasing the building capacity from 720 to 840 students, Rankin was over capacity for nearly every year from 1949 to 1967. In 1953 and 1955 boundary changes moved two small areas in the southeast corner of the Rankin ('55 0/977 0%) attendance zone to Schumacher ('55 7/1156 .6%). In 1957 the area east of Wildwood was moved into the attendance area for Portage Path (1/754 .1%). An optional zone for 1955 and 1956 between Rankin and Schumacher and the 1960 boundary change between the two schools will be discussed in connection with Schumacher.

When the Erie Island Elementary School opened in 1958 the western portion of the Rankin zone was detached to the new school. A line was drawn due west from

the intersection of Hawkins Avenue and Sunsetview Drive West; the area south of the line and west of Hawkins was taken out of the Rankin zone (0/882 0%) put into the Erie Island attendance zone (0/389 0%). Rankin was under capacity for one year (1959) after Erie Island opened. In 1961 the area east of Frederick, north of Delia, west of Hawkins, and south of the golf course was made optional between Erie Island (0/480 0%) and Rankin (0/876 0%). In 1962 the greater proportion of the area transferred in 1958, that portion north of Delia, Frederick, and Thorndale, was transferred back to Rankin. Also in 1962 additional territory was moved from Schumacher to Rankin. A band of territory south of West Market Street in the Fairlawn attendance zone was made optional to Rankin in 1962. (The option apparently terminated at the end of the year.) In 1963 Rankin was again used to relieve overcrowded schools to the south, receiving a small area from Crouse (as previously discussed).

In 1966 all the area west of Hawkins in the northwest corner of the Rankin attendance area (87/932 9.3%) was put into the Erie Island attendance zone. In 1972 a small square in the southeast corner of the Rankin attendance zone (509/1060 48%), south of Laughlin and west of Madison was shifted to Portage Path (249/771 32.3%). At the time, Rankin was slightly over capacity and Portage Path, well under capacity, could easily accommodate the 14 white and 50 black students affected by the change. The Court concludes, from an analysis of all these changes that race was not a factor in the decisionmaking of the school authorities that affected Rankin ('77 720/929 77.5%).

Schumacher Elementary School is located west of Crouse. In 1940 Schumacher served pupils from Akron Little Farms and Mount Hope, as well as those within its attendance area. The Schumacher attendance area was defined by a line running from the corporation limit east along Bridgewater Drive and Bye Street to Mineola, then south to Peckham, east to the eastern edge of the Buchtel High School campus, and then south to Copley Road.

The boundary line then ran east on Copley to Storer Avenue, south to Cadillac, west one block, then south on Mercer Avenue, west 2 blocks on Stoner, south on Packard, west on Courtland Avenue, and south on Hawkins to Wooster Road; finally the boundary ran southwest on Wooster Road to the corporation limit.

In 1942 five blocks just south of Courtland Avenue, from Hardesty west, were moved from Crouse (91/720 12.7%) to Schumacher (0/582 0%). In 1945 Akron Little Farms and Mount Hope were taken out of Schumacher and put into Crouse. At the same time, the area west of Hardesty and north of Diagonal Road was taken from the Crouse attendance area and included in the Schumacher zone.

Starting in 1947, Schumacher was consistently overenrolled. Although building additions increased the capacity in 1950 and 1953 (from 570 to 750, and then to 900), enrollments exceeded capacity for every year until 1968. In 1950 a boundary line was drawn due west from the intersection of Wooster Avenue and McTaggart Drive and the area south of the line was included in the Mount Hope area (at the time Mount Hope was assigned to Crouse). In 1953 a small area bordering the northwest corner of the Schumacher zone was moved from Rankin (1/898 .1%) to Schumacher (0/1050 0%); in 1955 another small area was similarly transferred from Rankin (0/977 0%) to Schumacher (7/1156 .6%). These areas were slightly closer to Schumacher than to Rankin; both schools were overcrowded. For 1955 through 1956 the area north of Peckham Street and east of Hawkins Avenue was optional between Schumacher and Rankin.

Located in the northwestern portion of the Schumacher zone, the Erie Island Elementary School opened in 1958. The area northwest of Hawkins Avenue, Little Street, Frederick Boulevard, and Lawton Street was taken out of the Schumacher attendance area and assigned to Erie Island. This brought the enrollment at Schumacher down from 1,288 to 1,143, but it was

still substantially higher than the building capacity which was then 900.

In 1960 Schumacher received additional pupils from Crouse (1034/1212 85.3%) when the area northwest of Dover Avenue and Wooster Avenue was reassigned. Since Schumacher needed relief even before the move from Crouse, another large area west of the expressway, in general terms the area northwest of Cordova, Thurston Street, Redbush, and Esterbrook Roads, was moved from Schumacher (211/1082 19.5%) to Erie Island (0/449 0%). Fifty white students were affected by the change. Also in 1960 the area northeast of Peckham and Hawkins, which had been optional between Schumacher and Rankin in the mid-1950's was moved into the Rankin attendance area (0/862 0%). Forty white students were affected. In 1960 Crouse with a capacity of 1080 served an enrollment of 1,212; Schumacher with a capacity of 900 served an enrollment of 1082; Erie Island with a capacity of 420 served an enrollment of 449.

In 1961 the area in the Schumacher zone (227/1000 22.7%) north of Copley Road was made optional to Rankin (0/876 0%) for a year. In 1962 the area was transferred to the Rankin attendance zone; the change affected 100 white students. Schumacher continued to be overenrolled, and in 1965 the remaining portion of the Schumacher attendance zone ('66 938/1078 87%) west of the expressway, and the area north of Stoner Street and west of Hawkins Avenue was moved to Erie Island ('66 11/585 1.8%). By the boundary change 100 white and 10 black students were reassigned to Erie Island. The evidence does not show that race was a factor in any of the decisions affecting Schumacher.

The enrollment pressures on the elementary schools in west Akron were a continuing problem for the school authorities even after elementary enrollments in the system had peaked in the late 1950's. While the system was trying to cope with the bulge in student population that was moving into the junior and senior high schools, the elementary schools in west Akron also needed relief. This is reflected in the Court's conclusions with regard to Crouse, Margaret Park, Rankin, and Schumacher. Building capacity, enrollment projections, distance and access factors were the motivating concerns. The evidence demonstrated a net migration of blacks into the attendance areas served by these schools, which is reflected in increasing black enrollments, but the evidence did not show that racial concerns entered into the decisionmaking of the school authorities.

Another means by which the school authorities tried to cope with the burgeoning elementary enrollments in west Akron was by using the Maple Valley School, presently known as the Rankin Annex, to house pupils in the lower grades. In 1952 the Rankin Annex housed 132 pupils in grades 1, 2, and 3 from Rankin and Schumacher. From 1953 through 1961 Schumacher pupils in grades 1, 2, and 3 were taught at the Rankin Annex. The building has a capacity of 150, and enrollment ranged from a low of 96 to a high of 148 during this period. The enrollment was all white until 1961 (17/148 11.3%). For 1962 and 1963 the Rankin Annex housed primary age pupils (kindergarten through grade 3) from Erie Island: 56 white pupils in 1962; 32 white pupils in 1963. For the next two years the building housed pupils in grades kindergarten through grade 2 from Erie Island, Rankin and Schumacher (enrollments of 157 and 128, racial data unavailable). In 1966 kindergarten and first grade students from the three schools attended classes at the Rankin Annex (80/164 48.7%) while third grade students attended classes at their home schools. For 1967 through 1969 the Rankin Annex ('67 107/110 97.2%) accommodated primary pupils from Schumacher alone.[22] Since 1970 the school has housed primary pupils from Rankin and Erie Island.

22. The building folder for the Rankin Annex indicates that since 1969 pupil enrollment data for the Annex has been included in the Schumacher, Rankin, and Erie Island building folders. Therefore, the Court assumes that for the period before 1969 the pupils in the Annex were in addition to the pupils listed at the other building folders.

Even using the Rankin Annex the school authorities could not solve the problem of housing all the students. They turned, therefore, to a solution which had worked effectively before, and built the Stewart Primary School. Stewart was built on Maxen Field, a vacant property the Board had owned for about 50 years. The plaintiffs attack the construction of Stewart and the drawing of its attendance boundary because Stewart opened in 1968 with an enrollment that was 83.4% black. The Board had previously built Guinther Primary School to relieve overcrowding at Highland Park Elementary School. The enrollments at Highland Park and at Guinther were all white. Since the Board had previously used the primary school in a situation without any racial overtones, the decision to use a primary school to solve an overcrowding problem is not suspect. The plaintiffs argue, however, that some of the area transferred from Schumacher to Erie Island in 1965 should have been included in the Stewart attendance zone in 1968. The testimony of Dr. Friedman and Board exhibit NNNN demonstrate to the Court that distance and access were the prime concerns of the school authorities in defining the Stewart attendance zone. Primary pupils are by definition the youngest students and access to Stewart from areas west of the expressway would have been hazardous due to traffic patterns and commercial development in the area. The Court accordingly finds that race was not a factor in the decisionmaking process as it affected Stewart.

4. *General Patterns*

A number of the specific attendance zone and option zones changes outlined above are consistent with the plaintiffs' thesis that the school authorities permitted white students to attend whiter schools. Whenever there was a change permitting students in a racially mixed area to move into a school with a lower proportion of black students enrolled, it is consistent with the plaintiffs' theory. Examining the specific changes, however, the Court has found no reason to believe race was a factor in the decision-

making process. The Court has further examined these changes in a broader perspective to determine whether in the aggregate the changes reveal a pattern which would show racial concerns were in the minds of the decisionmakers. Again, however, the Court finds that no such pattern is revealed. Building capacity, projected enrollments, distance, and access factors were the main concerns of the Board, as demonstrated by the changes that were made. Akron has not had uniform feeder patterns throughout the system, and one elementary school or junior high may feed its students into two different schools when they graduate. Yet where other constraints permitted, the school authorities have made changes to keep the boundaries consistent at all levels of the system to permit students to continue with their classmates.

The plaintiffs ask the Court to draw an inference of discriminatory intent from the option zones which continue in existence. When Superintendent Ott first joined the Akron school system, he wrote a memorandum to Dr. Friedman indicating that he wanted to see all option zones eliminated by 1976 (Plaintiffs' exhibit 79). Plaintiffs claim that failure to do so evidences a discriminatory motive, and point particularly to a memorandum written by Dr. Friedman which rated the sensitivity of various option zones (Plaintiffs' exhibit 73). Areas with high sensitivity, according to the plaintiffs, are areas where racial concerns are present. The Court finds that some of the areas rated high in sensitivity are areas where no racial concerns would be present. Option zones are being eliminated as part of other changes, particularly with school closures. The Court has seen no evidence suggesting that racial concerns prompted the changed timetable.

The evidence does show that during 1963 and 1964 race was a factor influencing certain Board decisions. Several Board letters from this period reflect meetings with NAACP representatives and leaders of the black community. The Board letters also reflect the superintendent's awareness of racial problems in the New York City

schools and elsewhere. There is no evidence, however, that these concerns spilled over into decisions affecting attendance boundaries, optional zones, or pupil assignments.

### 5. Teacher Assignments

The plaintiffs do not attack the hiring practices of the Board. They do claim that the black teachers hired were assigned in disproportionate numbers to schools with heavy black enrollments. Comparing the numbers of black and white teachers assigned to various schools, the plaintiffs have isolated some apparent imbalances. The plaintiffs have not, despite the small number of black teachers in the system in the early years, performed any statistical analysis to determine the significance of their numbers. The Court has analyzed the examples of imbalance offered by the plaintiffs using the formula:

$$z = \sqrt{\frac{p - P}{P\ (1 - P)}{N}}$$

where z = significance, p = school proportion, P = system proportion by level, and N = number of teachers in the school.[23]

At the elementary school level the plaintiffs support their allegations by looking at teacher assignments for two school years. For the 1967–68 school year the plaintiffs question the assignments to the schools listed below in column 1. Column 2 shows the percent black enrollment at the school for the 1967–68 school year; column 3 is the number of black teachers/total teachers in the school, and column 4 is the Court's calculation of z.

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| Barber | 20.5 | 0/22 | −1.5 |
| Bryan | 99.8 | 9/20 | 5.4 |
| Case | .2 | 1/31 | −1.2 |
| Crouse | 98.9 | 10/37 | 3.6 |
| Findley | 53.2 | 1/25 | −1.0 |
| Grace | 77.2 | 5/25 | 1.8 |

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| Harris | 3.5 | 0/21 | 1.5 |
| Hatton | .2 | 2/9 | − .5 |
| Howe | 97.3 | 6/21 | 2.9 |
| Lane | 99.4 | 6/23 | 2.7 |
| Leggett | 20.2 | 1/23 | − .9 |
| Lincoln | 31.6 | 5/32 | 1.2 |
| Margaret Park | 53.8 | 7/39 | 1.8 |
| Rimer | 0 | 0/14 | −1.2 |
| Robinson | 79 | 10/35 | 3.8 |
| Schumacher | 90.3 | 4/36 | .3 |
| Seiberling | 11.9 | 0/38 | −2.0 |

The defendants would concede that a value for z with an absolute value of 2 or more is significant. The Court finds that the assignments to Bryan, Crouse, Howe, Lane, Robinson, and Seiberling, were disproportionate in 1967–68. The assignments at Schumacher are also worthy of note, in light of its substantial black enrollment.

For the 1977–78 school year the plaintiffs' allegations focus on the schools listed below. (The format for the chart, and the figures included are the same as used previously.)

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| Bryan | 100 | 3/13 | .8 |
| Crouse | 96.4 | 6/31 | .7 |
| Fairlawn | 20.8 | 1/26 | −1.6 |
| Findley | 75.5 | 6/28 | .9 |
| Guinther | 2.2 | 0/7 | −1.1 |
| Hatton | .43 | 0/28 | −2.2 |
| Heminger | .34 | 1/12 | − .7 |
| Jackson | .88 | 0/13 | 1.5 |
| King | 3.4 | 1/22 | −1.4 |
| Lane | 99.3 | 6/23 | 1.5 |
| Margaret Park | 73 | 10/36 | 2.1 |
| Rankin | 77.5 | 8/41 | .8 |
| Rimer | .36 | 1/11 | − .6 |
| Ritzman | .21 | 1/21 | −1.3 |
| Robinson | 91 | 7/36 | .7 |
| Schumacher | 98.8 | 12/31 | 3.7 |
| Stewart | 94.7 | 3/12 | 1.0 |
| Windemere | 2.5 | 1/19 | 1.2 |

The Court finds that for the 1977–78 school year the teacher assignments to Hatton, Margaret Park, and Schumacher were disproportionate. Despite substantial black enrollments at Bryan, Crouse, Rankin, and Robinson, the assignments at those schools

**23.** In Castenada v. Partida, 430 U.S. 482, 496 n.17 (1977), the Supreme Court approved the use of this formula citing P. Hoel, Introduction to Mathematical Statistics 58–61, 79–86 (4th ed. 1971), and F. Mosteller, R. Rourke, & G. Thomas, Probability with Statistical Applications 130–46, 270–91 (2d ed. 1970).

do not show a significant deviation from a non-discriminatory assignment pattern. The defendants' calculations indicate that for the 1978–79 school year the teacher assignments at Hatton and Schumacher are the only ones which show a significant deviation.

For the junior high schools, the plaintiffs' concerns focus on teacher assignments to Thornton and West.

| | Thornton | | | West | | |
|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 2 | 3 | 4 |
| 1967–68 | 65.0% | 6/37 | 3.7 | 75.1% | 6/46 | 3.0 |
| 1968–69 | 71.2 | 7/49 | 3.3 | 76.6 | 5/53 | 1.7 |
| 1969–70 | 74.2 | 9/53 | 4.0 | 77.2 | 6/50 | 2.3 |
| 1970–71 | 80.1 | 6/52 | 1.8 | 80.8 | 7/50 | 2.5 |

For the 1977–78 school year, the plaintiffs add a number of predominantly white schools to their comparison:

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| Hyre | 0.3 | 1/48 | −1.3 |
| Innes | 2.3 | 0/44 | −1.8 |
| Perkins | 72.3 | 2/49 | − .7 |
| Thornton | 81.2 | 3/40 | .2 |
| West | 85.0 | 5/40 | 1.5 |

For the five high schools that are the focus of the plaintiffs' arguments, the figures are as follows:

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| | 1967–68 | | |
| Buchtel | 36.6 | 1/54 | − .8 |
| Ellet | 0 | 1/42 | − .6 |
| Firestone | 0 | 2/49 | − .0 |
| Kenmore | 7 | 0/64 | −1.7 |
| South | 89.3 | 9/43 | 5.5 |
| | 1969–70 | | |
| Buchtel | 49.5 | 3/56 | .6 |
| Ellet | .1 | 1/47 | − .6 |
| Firestone | .5 | 2/53 | − .1 |
| Kenmore | .7 | 0/63 | −1.6 |
| South | 93.3 | 10/47 | 6.1 |
| | 1970–71 | | |
| Buchtel | 56.3 | 7/59 | 2.9 |
| Ellet | .2 | 1/47 | − .7 |
| Firestone | .7 | 0/49 | 1.5 |
| Kenmore | 1.2 | 0/59 | −1.6 |
| South | 94.9 | 9/41 | 5.6 |

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| | 1973–74 | | |
| Buchtel | 66.1 | 8/71 | 1.8 |
| Ellet | 0 | 1/50 | −1.2 |
| Firestone | .7 | 2/53 | − .7 |
| Kenmore | 1.3 | 1/61 | −1.5 |
| South | 98.5 | 10/42 | 4.8 |
| | 1977–78 | | |
| Buchtel | 84.7 | 4/68 | 1.5 |
| Ellet | .3 | 1/58 | − .5 |
| Firestone | 1.3 | 1/49 | − .3 |
| Kenmore | 1.0 | 1/57 | − .5 |
| South | 97.6 | 9/44 | 7.0 |

The Court finds that for the secondary schools black teachers have been assigned in disproportionate numbers to Thornton and West in the past, but the pattern was corrected by 1977–78. The defendants' calculations indicate that for the 1978–79 school year only Jennings Junior High School showed an imbalanced teaching staff, and there is no claim that this is part of a pattern. There has likewise been a practice of assigning black teachers to South, and the disproportion has continued through 1978–79 according to the defendants' calculations.

The statistical analysis does not show a pattern inexplicable on grounds other than race. Furthermore, the evidence demonstrated that under the contract with the teachers union, teachers qualified for openings in the system were permitted to transfer at the close of the school year if they chose. Until 1974, a teacher's seniority determined his priority for a transfer, although the Board also reserved the right to assign staff in which at least 60% of the members had experience in the Akron Public Schools. New teachers were placed by the school authorities after voluntary transfers. Since 1974 the school authorities have had the power under the contract to reassign and transfer teachers to achieve or maintain a balance of race or sex within each building. Some of the imbalances identified by the plaintiffs are statistically significant, but the Court finds the plaintiffs have failed to show that race was a factor in the assignments made by the school authorities before 1974.

### 6. *Interacting and Multiplier Effect*

The plaintiffs claim that once a school is perceived as a black school or a white school by people choosing housing, white persons will not settle in residential areas served by black schools. Consequently, the plaintiffs say, if a high school or junior high school is perceived as a black school, the elementary schools serving that school will become black because white persons will not settle in their attendance zones. Plaintiffs call this the interacting and multiplier effect. During trial this effect was referred to as "signalling."

The testimony about signalling was given for the plaintiffs by Drs. Taeuber and Saltman. Dr. Taeuber gave his expert opinion as a sociologist and demographer that schools are an important factor in the minds of persons making housing decisions. He did not, however, detail the theoretical or factual basis for his opinion. Dr. Saltman also testified that schools are important to persons choosing housing. She based her opinion on studies done by the West Side Neighbors, a group in Akron. The West Side Neighbors questioned a sample group of residents in west Akron to determine their concerns about their neighborhoods. The studies, according to Dr. Saltman, reflected residents' concern about the schools. Further, she said the studies suggested that residents were thinking about moving to new neighborhoods or taking their children out of public school because of their dissatisfaction with schools in the area. The Court questions whether the concerns of these residents who have already made a housing choice are comparable to those in the process of making a housing decision. While the studies suggested people were thinking about changing their residence because of the schools, there is no evidence to suggest that persons actually moved because of the schools.

Another sociologist, Dr. Kantrowitz testified as an expert for the defendants. He testified that the empirical studies which have been done to determine what factors are important to people making housing decisions do not support the premise that schools are important. According to Dr. Kantrowitz, the few studies that have been done suggest that the schools are, at most, a marginal factor. The Court finds that the plaintiffs did not establish that signalling occurred in Akron.

### 7. *School Decommissioning*

The plaintiffs also claim that the Board's plan for school closures, called the Akron Plan, is racially discriminatory. They contend that all the schools, except Henry—the oldest school in the system—closed or scheduled for closure are schools with enrollments 70% or more black. Also, they claim that they are all located in black neighborhoods. From this they argue that the school authorities are willing to bus black children into white neighborhoods, but unwilling to bus white children into black neighborhoods. Nevertheless, the plaintiffs concede that the closures of Grace, Lane, and Thornton can be justified under a racially neutral decommissioning plan. The plaintiffs attack, therefore, the closure of Robinson and the proposed closure of South.

Except for Henry, all the schools selected for closure under the Akron Plan had predominantly black enrollments. In 1975, the year the Akron Plan was announced, the enrollment at Grace was 85.16% black, at Lane 99.6%, at Robinson 90.22%, at Thornton 80.9%, and at South 98%. School officials testified that other schools would be closed in the future, but no evidence was presented concerning schools which may be closed except under the Akron Plan. Looking at the schools closed and those scheduled for decommissioning, the Court must find that the burdens of school closure fall more heavily on black students. The great majority of the students who are being reassigned to new schools, often some distance from their former school, are black.

Based on Superintendent Ott's testimony, the Court finds that the race of the students was a factor considered in determining which schools should be closed under the Akron Plan. Other evidence suggested that the school closure decisions were made based upon the age of the building, utility

costs, declining enrollments, and the housing of various special programs, but the race of the students in the schools was important to Ott because he was seeking to improve racial balance in the remaining schools by the reassignment of students from the schools that were closed. Because racial concerns entered into the decision-making process, for whatever reason, and because the burden of school decommissioning falls disproportionately on black children, the Court finds the Akron Plan is unconstitutional. The violation is more limited than the plaintiffs suggest, however, in that the proposed student assignments to Riedinger Middle School demonstrate that the school authorities will bus white children to schools in black neighborhoods. There is no evidence that racial concerns entered into any other decisions of the school authorities, and the Court finds the constitutional violation is limited to school closures.

## 8. *Unequal Educational Opportunity*

Plaintiffs also claim that black and white students in the Akron Public Schools are denied equal educational opportunities. They base their allegations on stanine test score results and on data showing the allocation of Board funds to the elementary schools.

The claims alleging that the Board allocates less money to black schools than to integrated schools, and less money to integrated schools than to white schools was based on data presented in plaintiffs' exhibit 63A derived from figures provided by the Board. Those figures reflected an accounting error and the revised figures are presented in plaintiffs' exhibit 63B. The Court finds that the later figures are the correct figures and therefore finds no facts

supporting plaintiffs' contention that the Board allocates its funds in a racially discriminatory fashion.

Plaintiffs attempt to demonstrate unequal educational opportunity on the basis of stanine score data is more troubling—more troubling solely because the Court was given no guidance and no assistance in interpreting what is essentially raw data. Stanine scores were used by the school authorities to gauge the match between a student's ability and his performance. (They have now been replaced by another test.) The plaintiffs have taken the average scores for various schools then calculated average scores for three categories of schools: 1) schools with an enrollment 90% + white; 2) schools with an enrollment 70% + black; and 3) all other schools.

The Court cannot rely on the plaintiffs' averages as the basis for any factual findings for a number of reasons. First, the Court's knowledge of the tests and what they were designed to measure is too limited for the Court to appreciate how they reflect academic performance and, furthermore, how this relates to educational opportunity. Second, the record does not enable the Court to determine the statistical significance of the "average of averages" figures provided by the plaintiffs. Third, no evidence was presented that would permit the Court to evaluate the reliability of the test scores. Consequently, the Court cannot know the coarseness of the measurement and whether the apparent differences in the averages compiled by the plaintiffs is statistically meaningful or whether the difference is within the error factor. Therefore the Court finds that the plaintiffs failed to prove their claims of unequal educational opportunity.[24]

24. Assuming that the plaintiffs' figures demonstrated a significant difference between the stanine scores of various schools, the Court makes an alternative finding that the plaintiffs failed to demonstrate that the difference was attributable to the racial composition of the schools. The defendant school authorities suggest that any difference in performance can be attributed to varying socio-economic levels among the schools. Initially plaintiffs tried to disprove this explanation assuming that schools receiving Title I funds were all of a comparable socio-economic level. But, as the school authorities noted, if 18% of the student body at a particular school receives funds under the Aid to Dependent Children (ADC) program, the entire school qualifies for Title I funding. Assuming that students receiving ADC benefits are all of a comparable socio-economic level, Title I funding says nothing about the remainder of the

942

### 9. Attorney's Fees

Included in the plaintiffs' prayer for relief is a request for attorney's fees. In civil rights litigation attorney's fees can be awarded under 42 U.S.C. § 1988 which provides, in pertinent part:

> In any action or proceeding to enforce a provision of sections . . . 1983 . . . the court in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs.

The Court must initially determine whether the plaintiffs are a prevailing party. *Northcross v. Board of Education*, 611 F.2d 624 (6th Cir. 1979). In *Northcross*, the Sixth Circuit had no difficulty affirming the district court's determination that the plaintiffs' attorneys had "prevailed on the case as a whole." "Their clients have prevailed; the Memphis school system is desegregated." *Id.* at 636.

The plaintiffs herein have not prevailed on all their claims against the defendant Board and Superintendent. The Court has found that the Akron Plan for school closures is unconstitutional. Thus, the plaintiffs' attorneys have vindicated the constitutional rights of the plaintiffs and the class they represent. This is in accordance with the congressional purpose in passing § 1988: to promote the vigorous prosecution of civil rights claims. S.Rep.No.94–1011, 94th Cong., 2d Sess. 2–5 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 5908, 5909–12.

The plaintiffs did not establish their right to all the relief they sought, but they have achieved more than a bare declaration of rights. *Compare Seals v. Quarterly County Court*, 562 F.2d 390 (6th Cir. 1977) (although case was decided on state law grounds without reaching federal claims plaintiff was a prevailing party under § 1988 because plaintiff obtained the relief sought) *with Harrington v. Vandalia-Butler Board of Education*, 585 F.2d 192 (6th Cir. 1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979) (plaintiff obtained a declaration of rights in her favor but was not a prevailing party because she obtained no other relief). Recent dicta from the Sixth Circuit suggests that if plaintiffs prevail on "some substantial issue" they may be entitled to attorneys fees under § 1988. *Hildebrand v. Board of Trustees*, 607 F.2d 1282, 1283 (6th Cir. 1979). The plaintiffs have prevailed on a substantial constitutional issue and the Court holds that the plaintiffs are a prevailing party within the meaning of 1988. They will therefore recover attorneys fees against the defendants Board and Superintendent.[25]

### COUNT II: THE HOUSING CASE

#### A. Applicable Legal Principles

The theory of the plaintiffs' housing case is that

---

students who do not receive ADC funds. Where the number of students receiving ADC is fairly low, Title I funding is not a reliable indicator of the socio-economic level of the entire school. In an attempt to correct for this, the plaintiffs turned to census data and compiled figures showing the average home values, rental costs, and level of education in census tracts served by various schools. Again, however, the data is very rough. The Court is not told what proportion of the students in a particular school come from the census tracts listed, nor can the Court determine whether the averages given for people within the tract are representative of the corresponding data for families with school age children within the tract.

**25.** *Northcross* states that if the plaintiffs prevail on the case as a whole they are to recover fees for all claims and all issues in the case. The Sixth Circuit has not spoken in a case with

multiple defendants where the plaintiffs have prevailed on some of their claims against some of the defendants. As will be discussed *infra* the Court concludes that the plaintiffs have failed to prove their claims against the housing defendants. The Court does not find it necessary or appropriate under § 1988 or its legislative history to award attorney's fees to plaintiffs for claims asserted against defendants whose actions were found to be constitutional. Likewise, defendants should not be required to respond to an attorney's fee award when, as here, they were not called upon to defend the claims on which the plaintiffs prevailed. Under *Northcross* the plaintiffs will be entitled to recover fees from the Board of Education and Superintendent Ott for all the claims and issues regarding the actions of the Board and Superintendent. Plaintiffs are not entitled to recover fees for claims against the housing defendants.

even if the racially identifiable character of a large number of schools in thé system is due solely to residential racial segregation interacting with geographic attendance zoning, the fact remains that the intentional racially discriminatory and segregatory actions of government at all levels . . . were the primary cause of such residential racial segregation. This renders the resulting school segregation unconstitutional and subject to redress.

Plaintiffs' Post-Trial Brief at 2. The focus of the housing case is the system-wide desegregation remedy which was sought as relief. To the plaintiffs, the actions of the housing defendants and other governmental actors are relevant only to the extent that they justify this remedy. The Court cannot work backwards from a remedy. The first inquiry for the Court must be whether there has been a constitutional violation which requires a remedy. *Dayton Board of Education v. Brinkman (Dayton I)*, 433 U.S. 406, 417, 97 S.Ct. 2766, 2774, 53 L.Ed.2d 851 (1977); *Milliken v. Bradley*, 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974).

The plaintiffs believe that they have shown constitutional violations by the federal, state, and local government, and that they have therefore established the basis for the remedy they seek. But the plaintiffs have not joined all the governmental actors as parties to this case. The Court is without power to determine the rights and obligations of parties not before it. See Rule 19, Federal Rules of Civil Procedure.[26] The federal government and the state of Ohio are not before the Court in this case, and they have not been represented in this proceeding. Consequently, the Court will make no findings concerning the allegedly discriminatory acts of the state of Ohio, the federal government, or any federal agency.

The Court's inquiry with respect to the allegedly discriminatory actions of Paul Everson and the Ohio Real Estate Commission,

the city of Akron, and the Akron Metropolitan Housing Authority and its director, is essentially the same as the inquiry performed in the first part of this opinion. See supra at 918–920. Their actions violate the equal protection clause if race was a factor in the decisionmaking process.

### B. Discussion and Findings of Fact

#### 1. Paul J. Everson and the Ohio Real Estate Commission

The Ohio Real Estate Commission was created by section 4735.03 of the Ohio Revised Code to regulate real estate brokers in the state of Ohio. Paul J. Everson, the superintendent of real estate, is the executive officer of the Commission. Under section 4735.18 the superintendent "may, upon his own motion, and shall, upon the verified complaint in writing of any person, investigate the conduct of any licensee." The commission may suspend or revoke any license where the licensee is guilty of dishonest or illegal dealing, or guilty of "[a] final adjudication by a court of a violation of any municipal, state, or federal civil rights laws relevant to the protection of purchasers or sellers of real estate, provided that such violation arose out of a situation wherein parties were engaged in bona fide efforts to purchase, sell, or lease real estate . . . ." Ohio Revised Code § 4735.18(F), (G).

It was established that the superintendent and the commission did not investigate real estate practices in Akron or any alleged housing discrimination by any Akron broker. No evidence was presented to show that a verified complaint was ever submitted to Everson concerning the conduct of a broker or brokers in Akron. Dr. Saltman testified that she sent copies of housing audits conducted within the city to the director of the state department of commerce. The director of the department of commerce is a member of the Real Estate

---

**26.** No claim has been made that additional parties must or should be joined in this action. If the Court were to define its role more broadly it would require the Court to consider the matters raised in Rule 19 and the joinder of addition defendants. At this stage in the proceedings, the Court finds this to be the better approach.

Commission, and appoints the superintendent of the commission. Ohio Revised Code § 4735.05. The evidence did not show that the superintendent ever received a copy of the housing audit. Similarly no evidence showed that the commission failed to investigate or discipline a broker whose conduct brought him within section 4735.18(G). The Court finds no evidence of any discriminatory conduct by the Ohio Real Estate Commission or Paul J. Everson.[27]

## 2. The City of Akron

The plaintiffs make two claims against the city of Akron. First they claim that the city discriminated when the voters adopted, by referendum, an amendment to the city charter. Second, they claim that the city discriminated in relocating people who were displaced by urban renewal projects.

In 1964 the Akron City Council found that there was discrimination in the housing market within the city, and enacted a fair housing ordinance. A referendum was later presented to the voters of the city, placed on the ballot by petition of the voters. The referendum passed, amending the city charter to provide:

> Any ordinance enacted by the Council of The City of Akron which regulates the use, sale, advertisement, transfer, listing assignment, lease, sublease or financing of real property of any kind or of any interest therein on the basis of race, color, religion, national origin or ancestry must first be approved by a majority of the electors voting on the question at a regular or general election before said ordinance shall be effective. Any such ordinance in effect at the time of the adoption of this section shall cease to be effective until approved by the electors as provided herein.

This charter amendment was held unconstitutional by the Supreme Court in *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969).

The act of the city which was held unconstitutional in *Hunter*, and the action on which the plaintiffs claim is based, is the enactment of the charter amendment. After the amendment was declared unconstitutional it was without force or effect and the violation was remedied. The plaintiffs apparently contend that the charter amendment, even after it was declared unconstitutional, had the further effect of giving official city approval to housing discrimination, which, in their view, equals unconstitutional discrimination by the city that is subject to redress.

The plaintiffs offered no direct evidence that the charter amendment had this continuing effect. Dr. Taeuber and Dr. Saltman testified that in their opinion the amendment would have such an effect on persons in the housing market. But the basis for their opinions was not explained, and the Court cannot evaluate the strength of the foundation on which the opinions were built. There was no suggestion that sociological studies have been done which support their conclusions. Dr. Taeuber claims no familiarity with the housing market in Akron, and Dr. Saltman did not explain any incidents or otherwise suggest why she concluded that the charter amendment had such a continuing effect. Therefore the Court finds the plaintiffs have failed to prove this portion of their claim against the City.[28]

Regarding the urban renewal displacees the plaintiffs' claim is essentially that the city permitted too many of these people to use the discriminatory housing market, and that the city failed to take sufficient affirmative action to protect displacees from

---

**27.** In their post-trial brief the plaintiffs say:

It is clear, therefore, that the State of Ohio has seriously disabled the Ohio Real Estate Commission from taking action to discipline licensees for practicing racial discrimination

. . . . .

This is apparently the main thrust of the plaintiffs' claim against Paul J. Everson and the Ohio Real Estate Commission, but the State of Ohio is not a party before the Court.

**28.** The Court, therefore, does not reach the question whether such a continuing effect would equal action by the city which deprives plaintiffs of equal protection of the laws.

an otherwise discriminatory housing delivery system. Thus, say the plaintiffs, a majority of the black displacees ended up in west Akron, in census tracts which were impacted in 1972. (A tract is considered impacted if it has a minority population in excess of 50% of the total, or if the black population in the tract increased by more than 10% between 1960 and 1970.)

In aiding the urban renewal displacees the city's goals were essentially two-fold. First, the city helped displacees obtain the federal financial assistance that was available to them. Second, city employees were available to help people relocate to safe and sanitary housing that would meet their housing needs. The evidence showed that those administering the program for the city tried to locate displacees of all races throughout the city. There was no evidence to suggest race was a factor in the decisionmaking of any city employee. Consequently, the Court finds the plaintiffs have not proved that the city's actions were unconstitutional.

3. *The Akron Metropolitan Housing Authority*

The plaintiffs claim that the Akron Metropolitan Housing Authority discriminated by operating housing projects that were segregated by race and by discriminatory placements into the leased and scattered site housing within the city.

The housing authority built three public housing projects in the 1940's. Norton Homes is a project located in the city of Barberton, and it has not been the focus of the plaintiffs' allegations.

Elizabeth Park was located just north of downtown Akron. The area had been a slum area with a predominately black population. The population in census tract 5011, which includes Elizabeth Park, was 38.6% black in 1930; in 1940 tract 5011 had a population more than 50% and less than 75% black. In 1950, tract 5011 was 74.1% black. The Court finds that the residents at Elizabeth Park when it opened were predominantly black because of the composition of the surrounding neighborhood. At the time, applications for public housing projects were taken at the project, and the applicants chose the project where they wanted to apply. The Court finds no reason to conclude that race was a factor influencing the decisions of the Akron Metropolitan Housing Authority with respect to Elizabeth Park. Children living in Elizabeth Park attend Bryan Elementary School, and Bryan was 62% black before the project opened. Therefore, the Court finds that the project did not cause Bryan to become a racially identifiable or majority black school.

Edgewood Homes was located in a predominantly white residential area, and all the residents were white. As with other projects, until 1968 all applications for units in a project were made at the project. As Edgewood Homes straddles two census tracts, census data is not an effective tool to measure changes in the racial composition of the neighborhood. The composition of the student body at Lane Elementary School is the best measure of the changing neighborhood. In 1942 Lane had a black enrollment of 13.5%. By 1950 the black enrollment was 34.5% and by 1955 it was a majority black school with a black enrollment of 57.1%. In 1959 the housing authority moved the first black family into Edgewood Homes in order to integrate the project. In 1959 Lane had a black enrollment of 88.4%. The Court finds that race was a factor in the decision to place several black families into Edgewood Homes in the late 1950's, and that the placements were made to improve the racial balance of the tenant population. At the same time white families were introduced into projects where the tenants were all black. There was no evidence to suggest that these attempts to achieve integration fell disproportionately on black people. The Court finds that all other placement decisions with respect to Edgewood Homes were made on the basis of racially neutral criteria.

By early 1968 only about 5% to 10% of the tenants at Edgewood Homes were white. Edgewood Homes was in the midst of the racial riots which occurred in Akron in 1968.

White persons on the housing authority staff working at Edgewood Homes were removed from the project at gunpoint. Out of fear for the safety of their employees and tenants, the housing authority removed the white people from Edgewood Homes. While race was a factor in this decision, the Court finds no reason to infer that this racial motivation extended to any other decisions made by the housing authority.

During World War II the federal government established three war housing projects in Akron to house people working in the tire and rubber factories. Land was leased from private owners, and temporary housing was built. After the war the buildings were made available to the local housing authority for a price of $1 on the condition that the housing authority buy the land. The Akron Metropolitan Housing Authority acquired Hillwood Homes, Wilbeth-Arlington, and Ardella Homes in this fashion. These projects were operated at market rent levels, in other words, there were no rent subsidies for tenants in these projects.

Wilbeth-Arlington and Hillwood Homes came to the housing authority in the early 1950's with a white tenant population reflecting the racial composition of the neighborhoods around them. Portions of the Wilbeth-Arlington project were remodeled in the late 1960's, that part is now known as Rosemary Square. After the remodeling, rent subsidies were available. Hillwood Homes has likewise been remodeled. No evidence was presented to show that race was a factor affecting tenant assignment at Wilbeth-Arlington, Rosemary Square, or Hillwood Homes. The new development which has replaced Hillwood Homes, James Village Square, was created by a private contractor financed through industrial revenue bonds issued by the housing authority. The Akron Metropolitan Housing Authority has no control over tenant assignments as at James Village Square.

Ardella Homes was used by the federal government to house single, Jamaican laborers working in the factories during the war. The two-hundred-unit project was located in an integrated but largely white neighborhood. During the late 1940's the federal government replaced the Jamaican workers with black families.[29] Robinson School which served an attendance area including Ardella Homes had an enrollment that was 31% black in 1945. By 1949 the black enrollment had increased to 40%, and in 1950 it increased to 44.2%. In 1953, when the project was deeded to the housing authority Robinson was already a majority black school with a 54.9% black enrollment. The black pupils from the black families living in Ardella Homes contributed to the increasing black enrollment at Robinson Elementary School, but the Court finds no evidence that race was a factor influencing the decisions of the housing authority with respect to Ardella Homes.

Ardella Homes was modernized in the late 1960's. Tenants in the project, now known as Joy Park, were for the first time eligible for rent subsidies. As with other modernization programs conducted by the housing authority, the modernization was conducted in-place and carefully structured to permit qualified residents of the old project to be placed in the remodeled units. While this preserves the racial composition of the project, it was done to minimize inconvenience to the tenants. The Court finds no reason to infer that race was a factor in the decision to structure the modernization in this manner.

The plaintiffs make no claim concerning projects which have been more recently constructed by the housing authority. Their other claim focuses on placement for the leased and scattered site housing administered by the housing authority, particularly placements in the late 1960's when the programs were first begun. Under the leased housing program the housing authority provides rent subsidies for qualifying

---

**29.** There was a suggestion at trial that the housing authority played a role in the administration of the war housing projects before they were formally deeded to them by the federal government. No evidence was presented that would permit the Court to determine when this occurred or what the housing authority's responsibilities were.

tenants and landlords. For the scattered site program, the housing authority actually purchases a dwelling and then rents to qualified tenants. In 1968 the housing authority established a centralized application office. All applications for the leased and scattered site program were made to the central office. Applicants could state a preference for a particular kind of housing or for a particular part of the city.

Under guidelines established by the federal department of Housing and Urban Development, applicants were permitted to refuse with impunity two locations which were made available to them by the housing authority. If a third residence was offered and refused, the applicant's name was sent to the bottom of the waiting list. The waiting list in Akron has ranged from a list of 7,000 names to a list of 13,000. An applicant whose name was sent to the bottom of the list would probably have to wait several years before public housing would again be available to him.

From information made available by the housing authority the plaintiffs determined that 79% of all black families in leased and scattered site housing are located in 6 census tracts within the Buchtel High School area, and that 93% of all white families in leased and scattered site housing are dispersed through the city's non-impacted areas. Approximately one third of the people involved in the leased housing program in its early years were qualified in place, that is to say that the tenant never moved. Both tenant and landlord qualified, and the rent subsidy began paying part of the rent.

The plaintiffs' figures for leased and scattered site housing also include section 8 housing. Under the section 8 program a qualified person receives a certificate which entitles him to a rent subsidy. The tenant locates the housing of his choice and the sole concern of the housing authority is whether the site is safe and sanitary. As the housing authority has nothing to do with placing people under the section 8 program, the Court can find no constitutional violation by the housing authority in placement under the section 8 program.[30]

Perine Nealy, who administered the placements for leased and scattered site housing testified that she attempted to place black families in predominately white neighborhoods and white families in predominantly black neighborhoods. She further stated that if an applicant had stated a preference for a particular area, after the applicant had rejected two sites which had been offered, she offered a third site within the area of preference. Some applicants, according to Nealy, chose to reject the third residence offered, and their names went to the bottom of the list. Nealy's testimony suggests that racial concerns prompted many applicants to reject housing which was offered. The Court finds, however, that race was not a factor in the decision-making of people at the housing authority. The housing authority was operated to make safe, sanitary housing available to people of all races in all parts of the city. The housing authority also permitted an applicant to reside in the area of his preference.

The plaintiffs complain about the housing authority's placement of urban renewal displacees. From the Opportunity Park urban renewal project 72 white families (4% of the total families displaced) and 184 black families (10% of total families displaced) were referred to the housing authority for placement. Thirteen families or 3% of the total number displaced by the Grant-Washington project were referred to the housing authority for placement; all except one were black. Urban renewal displacees were given top priority for placement by the housing officials. They had unlimited choice. Urban renewal displacees could reject an infinite number of residences that were of-

30. The leased housing program has now been entirely supplanted by section 8. The record does not permit the Court to determine when this was accomplished or the rate at which the transition occurred.

fered to them. (Large family size, and transportation limitations also made the families difficult to place.) As with section 8 housing, the placement decision was essentially made by the applicant, or the displacee, and the Court finds no violation by the housing authority in the relocation of urban renewal displacees.

The plaintiffs have pointed to no constitutional obligation that would require the housing authority to integrate projects or to place persons so as to achieve a specific racial proportion. The evidence demonstrated that the housing authority has attempted to improve the racial balance in neighborhoods and projects throughout the city, but as the Court has found such efforts were not constitutionally required, it is unnecessary to detail their success.

In sum, the Court finds that the plaintiffs have failed to prove that race was a factor in the decisionmaking of the Akron Metropolitan Housing Authority, or that racial concerns affected decisions made by any of the housing defendants.

### III. *CONCLUSION*

The magnitude of this case has required the Court to determine numerous issues of fact and law. The Court has been greatly aided in this task by the diligence and cooperation of all counsel, and the Court commends them for their efforts.

Upon consideration of the entire record herein, the Court specifically finds:

1. The Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1343.

2. The plaintiffs in this action represent themselves and two subclasses: 1) All white students and parents of white students now attending or in the future eligible to attend the Akron Public Schools; and 2) All non-white students and parents of non-white students now attending or in the future eligible to attend the Akron Public Schools.

3. The actions of the Board of Education and Superintendent Ott in drawing attendance boundaries, creating optional attendance zones, and permitting student transfers have not violated plaintiffs' right to equal protection of the laws secured by the fourteenth amendment to the United States Constitution, nor have these actions violated the fourteenth amendment rights of the plaintiff class.

4. The teacher assignments made by the Board of Education and Superintendent Ott have not violated the plaintiffs' right to equal protection of the laws secured by the fourteenth amendment nor have these assignments violated the fourteenth amendment rights of the plaintiff class.

5. The unconstitutional decisions regarding school decommissioning made by the Board of Education and Superintendent Ott have violated the rights of plaintiffs and the class they represent as guaranteed by the equal protection clause of the fourteenth amendment.

6. The effects of the unconstitutional decisions regarding school decommissioning continued at the time of trial, but they have not alone, or in combination with other practices complained of, created or maintained an intentionally segregated school system within the city of Akron.

7. The Board of Education and Superintendent Ott have not denied equal educational opportunities to plaintiffs or the class they represent in violation of their right to equal protection of the laws as guaranteed by the fourteenth amendment.

8. The plaintiffs are a prevailing party under 42 U.S.C. § 1988 and are entitled to recover attorney's fees against the defendant Board of Education and Superintendent Ott.

9. The rights of the plaintiffs and the class they represent to equal protection of the laws guaranteed by the fourteenth

amendment were not violated by Paul J. Everson, the city of Akron, the Mayor, the Akron Metropolitan Housing Authority, or its director.

10. The credible evidence has failed to establish the other allegations, contained in the plaintiffs' complaint and the updates of the plaintiffs' allegations, as to any of the defendants.

11. There is no just reason to delay the entry of judgment in favor of the defendants Paul J. Everson, the city of Akron, the Mayor, the Akron Metropolitan Housing Authority and its director on all claims asserted against these defendants.

12. This Order involves controlling questions of law as to which there is a substantial ground for difference of opinion, and an immediate appeal from this Order may materially advance the ultimate termination of the litigation.

Accordingly,

IT IS ORDERED that the plaintiffs' complaint is hereby dismissed on the merits with prejudice as to Paul J. Everson, the city of Akron, the Mayor, the Akron Metropolitan Housing Authority and its director; the Court hereby expressly directs that judgment be entered in favor of these defendants under Rule 54(b), Federal Rules of Civil Procedure;

IT IS FURTHER ORDERED that the Board of Education, its members, Superintendent Ott, their employees, agents, and anyone acting in concert with them are hereby permanently enjoined from discriminating against the plaintiffs and the class they represent in school decommissioning;

IT IS FURTHER ORDERED that the Board of Education and Superintendent Ott immediately take steps to remedy the effects of their unconstitutional decisions regarding school decommissioning, and that they file with the Court and submit to counsel for the plaintiffs on or before May 9, 1980 a plan to eliminate expeditiously, effectively, and fully the effects of the unconstitutional decisions regarding school decommissioning; on or before May 20, 1980 the plaintiffs shall file and serve on defendants any objections to the defendants' plan or any alternative plan(s) they propose;

IT IS FURTHER ORDERED that the action is hereby certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

Appendix to follow.

## APPENDIX A

### A K R O N P U B L I C S C H O O L S

PUPIL RACIAL COUNT
OCTOBER 4, 1978

| SCHOOL SENIOR | BLACK # | BLACK % | WHITE # | WHITE % | OTHER* # | OTHER* % | TOTAL ENROLL. |
|---|---|---|---|---|---|---|---|
| Buchtel | 1,180 | 81.04% | 267 | 18.34% | 9 | .62% | 1,456 |
| Central-Hower | 493 | 39.66% | 743 | 59.78% | 7 | .56% | 1,243 |
| East | 362 | 33.08% | 724 | 66.18% | 8 | .74% | 1,094 |
| Ellet | 5 | .42% | 1,176 | 98.90% | 8 | .68% | 1,189 |
| Firestone | 21 | 1.92% | 1,053 | 96.43% | 18 | 1.65% | 1,092 |
| Garfield | 325 | 23.70% | 1,044 | 76.15% | 2 | .15% | 1,371 |
| Kenmore | 13 | 1.08% | 1,196 | 98.76% | 2 | .16% | 1,211 |
| North | 497 | 27.49% | 1,291 | 71.41% | 20 | 1.1% | 1,808 |
| South | 514 | 96.07% | 21 | 3.93% | 0 | -- | 535 |
| Sub-Total | 3,410 | 31.00% | 7,515 | 68.32% | 74 | .68% | 10,999 |
| Goodrich | 261 | 26.02% | 703 | 70.09% | 39 | 3.89% | 1,003 |
| Goodyear | 411 | 36.15% | 717 | 63.06% | 9 | .79% | 1,137 |
| Hyre | 7 | .64% | 1,082 | 99.36% | 0 | -- | 1,089 |
| Innes | 28 | 3.06% | 886 | 96.83% | 1 | .11% | 915 |
| Jennings | 252 | 32.48% | 511 | 65.85% | 13 | 1.67% | 776 |
| Kent | 73 | 7.47% | 899 | 92.01% | 5 | .52% | 977 |
| Litchfield | 46 | 5.49% | 771 | 92.00% | 21 | 2.51% | 838 |
| Perkins | 828 | 74.59% | 281 | 25.32% | 1 | .09% | 1,110 |
| Thornton | 659 | 79.69% | 166 | 20.07% | 2 | .24% | 827 |
| West | 743 | 88.87% | 89 | 10.65% | 4 | .48% | 836 |
| Sub-Total | 3,308 | 34.79% | 6,105 | 64.21% | 95 | 1.0% | 9,508 |
| Barber | 143 | 23.76% | 457 | 75.92% | 2 | .32% | 602 |
| Barrett | 108 | 15.56% | 581 | 83.72% | 5 | .72% | 694 |
| Bettes | 101 | 20.91% | 377 | 78.05% | 5 | 1.04% | 483 |
| Betty Jane | 9 | 1.21% | 721 | 96.39% | 18 | 2.4% | 748 |
| Case | 105 | 17.47% | 487 | 81.03% | 9 | 1.5% | 601 |
| Crosby | 142 | 64.25% | 79 | 35.75% | 0 | -- | 221 |
| Crouse | 566 | 98.10% | 10 | 1.73% | 1 | .17% | 577 |
| Erie Island | 429 | 71.74% | 168 | 28.09% | 1 | .17% | 598 |
| Essex | 96 | 25.95% | 266 | 71.89% | 8 | 2.16% | 370 |
| Fairlawn | 129 | 22.55% | 440 | 76.92% | 3 | .53% | 572 |
| Findley | 453 | 75.63% | 141 | 23.54% | 5 | .83% | 599 |
| Firestone Park | 5 | .78% | 631 | 99.06% | 1 | .16% | 637 |
| Forest Hill | 40 | 8.62% | 417 | 89.87% | 7 | 1.51% | 464 |
| Fraunfelter | 19 | 5.61% | 315 | 92.92% | 5 | 1.47% | 339 |
| Glover | 356 | 48.31% | 379 | 51.42% | 2 | .27% | 737 |
| Guinther | 6 | 3.19% | 175 | 93.09% | 7 | 3.72% | 188 |
| Harris | 198 | 26.02% | 556 | 73.06% | 7 | .92% | 761 |
| Hatton | 3 | .44% | 665 | 97.94% | 11 | 1.62% | 679 |
| Heminger | 0 | | 252 | 100.00% | 0 | -- | 252 |
| Highland Park | 2 | .48% | 419 | 99.52% | 0 | -- | 421 |
| Hill | 163 | 28.75% | 404 | 71.25% | 0 | -- | 567 |
| Hotchkiss | 14 | 3.83% | 352 | 96.17% | 0 | -- | 366 |
| Jackson | 41 | 11.99% | 297 | 86.84% | 4 | 1.17% | 342 |
| King | 21 | 4.32% | 460 | 94.65% | 5 | 1.03% | 486 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Lane | 387 | 98.72% | 3 | .77% | 2 | .51% | 392 |
| Lawndale | 0 | | 287 | 100.00% | 0 | -- | 287 |
| Leggett | 162 | 31.39% | 341 | 66.08% | 13 | 2.53% | 516 |
| Lincoln | 465 | 54.32% | 385 | 44.98% | 6 | .70% | 856 |
| Margaret Park | 501 | 70.37% | 209 | 29.35% | 2 | .28% | 712 |
| Mason | 79 | 12.04% | 567 | 86.43% | 10 | 1.53% | 656 |
| McEbright | 217 | 42.14% | 297 | 57.67% | 1 | .19% | 515 |
| Pfeiffer | 0 | | 301 | 99.67% | 1 | .33% | 302 |
| Portage Path | 330 | 54.01% | 279 | 45.66% | 2 | .33% | 611 |
| Rankin | 747 | 78.30% | 202 | 21.17% | 5 | .53% | 954 |
| Rimer | 5 | 1.97% | 249 | 98.03% | 0 | -- | 254 |
| Ritzman | 1 | .21% | 477 | 99.79% | 0 | -- | 478 |
| Robinson | 563 | 89.94% | 59 | 9.42% | 4 | .64% | 626 |
| Schumacher | 638 | 99.22% | 5 | .78% | 0 | -- | 643 |
| Seiberling | 124 | 14.76% | 712 | 84.76% | 4 | .48% | 840 |
| Smith | 1 | .27% | 366 | 99.73% | 0 | -- | 367 |
| Stewart | 306 | 95.03% | 14 | 4.35% | 2 | .62% | 322 |
| Voris | 7 | 1.90% | 361 | 97.83% | 1 | .27% | 369 |
| Windemere | 10 | 2.46% | 394 | 97.04% | 2 | .50% | 406 |
| Sub-Total | 7,692 | 34.32% | 14,557 | 64.96% | 161 | .72% | 22,410 |
| GRAND TOTAL | 14,410 | 33.58% | 28,177 | 65.65% | | | 42,917 |

*Includes: Hispanic, Indian, and Asian.

APPENDIX B

———————— South High School attendance zone 1977-78

• • • • • • • • South High School attendance zone 1940

—— ·· —— ·· —— Corporation limit

+++++++++ Railroad tracks

1. Perkins Park

South to West 1950

West to South 1953

— — — — Buchtel-South optional zone, created 1956

2. part of Buchtel-South option zone which lost option in 1960

South to Mount Hope 1950

+ + + + + + Mount Hope

3. Mud Run Park

— — — — South-Kenmore optional zone 1952-55

South to Kenmore 1956

South-Kenmore optional zone 1956-58

South to Kenmore 1958

South to Kenmore 1960

South to Kenmore 1970

4. South-Central optional zone 1956-61, put in Central attendance zone 1962

South to Garfield 1954

South-Garfield optional zone 1956-57, put in Garfield attendance zone in 1958

APPENDIX C

## APPENDIX D

APPENDIX E

Corporation Limit

Boundary line for attendance areas as of 1940

1. Municipal Golf Course

Rankin to Erie Island 1966

Erie Island to Rankin 1962

Rankin-Erie Island optional zone 1961

2. Rankin to Erie Island 1958

Rankin to Schumacher 1955

Rankin to Schumacher 1953

3. Schumacher-Rankin optional zone 1955-56 transferred to Rankin 1960

Schumacher-Rankin optional zone 1961 transferred to Rankin 1962

Schumacher to Erie Island 1958

4. Schumacher to Erie Island 1960

Schumacher to Erie Island 1965

5. Crouse to Schumacher 1942

Crouse to Schumacher 1945

Crouse to Schumacher 1960

6. area subject to four boundary changes and one option zone between crouse and Lane 1956-63

Perkins Park

7. Crouse to Rankin 1963

Crouse to Portage Page 1963

Rankin to Portage Path 1972

Rankin to Portage Path 1957